Donald L. CASTLE, Appellant,

v.

STATE of Alaska, Appellee.

No. A–7093.

Court of Appeals of Alaska.

May 5, 2000.

Rehearing Denied May 31, 2000.

---

Marcia E. Holland, Assistant Public Defender, Fairbanks, and Barbara K. Brink, Public Defender, Anchorage, for Appellant.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellee.

Before COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

On December 4, 1997, at approximately 3:30 in the morning, Fairbanks Police Officer Gary A. Yamamoto stopped a vehicle because one of its headlights was out. Donald L. Castle was a passenger in this car.

Officer Yamamoto questioned the driver, Michael Browning, and found out that Browning's driver's license was revoked. As Yamamoto was taking Browning into custody, Castle got out of the car and announced that he wanted to leave. Yamamoto directed Castle to get back in the car and stay there until the officer could interview him. Yamamoto then escorted Browning back to his patrol car. While Yamamoto's attention was focused on the driver, Castle walked away from the scene.

After securing Browning in his patrol car, Yamamoto began driving through the neighborhood, searching for Castle. Yamamoto discovered Castle walking along the street, on the sidewalk. The officer pulled his patrol car alongside Castle and stated, "Sir, I need to talk to you for just a moment." At that point, Castle started running. Castle left the sidewalk and ran into the middle of the street, right in front of Yamamoto's patrol car. Yamamoto turned on his overhead lights and gave chase.

Yamamoto followed Castle for approximately three blocks. Observing that Castle was beginning to tire, the officer pulled up next to Castle, rolled down his window, and gave Castle a push into the snowbank on the side of the road. Yamamoto then got out of his patrol car and chased Castle on foot. When the officer caught Castle, the two men grappled for a few minutes, but Castle eventually submitted.

Yamamoto handcuffed Castle and patted him down for weapons. Although he found no weapons, Yamamoto carried Castle back to the patrol car and searched him again for drugs. This search yielded several small plastic bags with white powder residue in them; this residue field-tested positive for cocaine. Yamamoto then arrested Castle. Castle subsequently pleaded no contest to fourth-degree misconduct involving controlled substances[1], reserving his right to contest the legality of the stop that led to the discovery of the cocaine.[2]

On appeal, Castle renews his challenge to the legality of the stop, but he also disputes the intensity of the search that followed the stop. He points out that, during an investigative stop, an officer may engage in only a

limited body search: a pat-down for weapons.[3] Castle argues that even if Yamamoto was justified in making the stop, the officer nevertheless exceeded his authority when he searched Castle for drugs after the weapons pat-down yielded nothing.

This second argument concerning the intensity of the search is raised for the first time on appeal; Castle did not present it to the superior court. Accordingly, we decline to address it.[4] We turn, instead, to the issue that Castle did preserve: the legality of the stop.

■ "[W]henever a police officer accosts an individual and restrains his freedom to walk away, [the officer] has 'seized' that person" for purposes of the Fourth Amendment.[5] Moreover, a police officer's conduct may be deemed a "restraint" of a citizen's freedom even when the officer does not use force. "[T]he question of whether an investigative stop occurred [hinges on whether] the challenged police conduct would lead a reasonable person to believe that the person was not free to leave."[6] Because the average person often feels "an obligation to respond to [police] questions and not to walk away", a seizure occurs only when the police officer "add[s] to these inherent pressures by engaging in conduct which a reasonable [person] would view as threatening or offensive even if coming from another private citizen."[7]

■ For Fourth Amendment purposes, a seizure occurs whenever a police officer engages in "a show of official authority such that a reasonable person would have believed that he [or she] was not free to leave."[8] The

---

1. AS 11.71.040(a).

2. See *Cooksey v. State*, 524 P.2d 1251, 1255–57 (Alaska 1974).

3. See *Gray v. State*, 798 P.2d 346, 350 (Alaska App.1990).

4. See *Moreau v. State*, 588 P.2d 275, 279–280 (Alaska 1978) (barring egregious circumstances, search and seizure violations can not be raised on appeal if they were not raised in the trial court).

5. *Terry v. Ohio*, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968).

6. *Ozhuwan v. State*, 786 P.2d 918, 920 (Alaska App.1990).

7. *Waring v. State*, 670 P.2d 357, 364 (Alaska 1983) (quoting Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (1978), § 9.2, Vol. 3, pp. 53–54).

8. *Rogers–Dwight v. State*, 899 P.2d 1389, 1390 (Alaska App.1995) (quoting *Florida v. Royer*, 460 U.S. 491, 502, 103 S.Ct. 1319, 1326, 75 L.Ed.2d 229 (1983)).

Alaska Supreme Court uses this same test when determining whether a seizure has occurred for purposes of the search and seizure clause of the Alaska Constitution (Article I, Section 14).[9] Under this test, when a police officer instructs a person to sit in a patrol car, the officer "seizes" the person.[10]

That is what happened in Castle's case. When Castle announced that he intended to leave the scene, Officer Yamamoto responded by telling Castle to "hold on", to "have a seat in the car", and to wait there until the officer returned. We believe that a reasonable person in Castle's position would have interpreted this exchange as an exercise of authority—a directive to remain where he was until the officer allowed him to depart.

In his dissent, Judge Coats suggests that Yamamoto's response to Castle was only a request, not a command. He points out that, according to Yamamoto's testimony, his exact words to Castle were: "Why don't you have a seat in the car. I'll be right back with you." Judge Coats concludes that, given Yamamoto's phrasing, a reasonable person in Castle's position would not have believed that Yamomoto was ordering him to stay, but only asking him to stay—a request that Castle was free to honor or decline.

Given the circumstances in which Yamamoto and Castle exchanged these words, Judge Coats's interpretation of their conversation appears overly generous to the State. But even if we assume that Yamamoto's first words to Castle might reasonably be construed as a request rather than an order, there was no mistaking the tenor of Yamamoto's second colloquy with Castle. After Castle declined Yamamoto's "request" and walked away from the scene of the traffic stop, Yamamoto refused to accept Castle's decision. The officer hunted Castle through the neighboring streets, then pulled alongside Castle in his patrol car and told him, "I need to talk to you for just a moment." At this juncture (if not before), a reasonable person in Castle's position would believe that the officer was ordering him to stop and submit to questioning.

At that point, a seizure occurred—or, more precisely, a seizure would have occurred had Castle followed the officer's instruction. As it happened, Castle ignored the officer's order. The actual seizure occurred a few moments later when Yamamoto chased after Castle, blocked his path with the patrol vehicle, and wrestled him to the ground.

The State offers three rationales to support this seizure. First, the State argues that Castle was a witness to Browning's crime of driving with a revoked license. Second, the State argues that Castle's sudden exit from the car caused Yamamoto to reasonably fear that Castle might assault him. And third, the State argues that Castle himself committed a crime by running into the middle of the street. We discuss these three rationales in turn.

But before we begin those discussions, it is important to note an argument that the State has not raised. The United States Supreme Court has ruled that, in the interest of officer safety, police officers making a traffic stop have the authority to order the driver and the passengers out of the car, even when there is no articulable reason to fear that these people might assault the officer.[11] Castle's case potentially raises a related but different issue: during a routine traffic stop, when there are no circumstances that would justify an investigative stop of the passenger, does a police officer nevertheless have the authority to order a passenger to remain in the car and not leave the scene? The United States Supreme Court has expressly refrained from deciding this issue.[12]

We note that the Washington Supreme Court and the Maryland Court of Appeals have ruled that police officers do not possess

9. *Waring,* 670 P.2d at 364.

10. *See id.*

11. *See Maryland v. Wilson,* 519 U.S. 408, 117 S.Ct. 882, 137 L.Ed.2d 41 (1997) (authority to order passengers out of the car); *Pennsylvania v. Mimms,* 434 U.S. 106, 98 S.Ct. 330, 54 L.Ed.2d 331 (1977) (authority to order the driver out of the car).

12. *See Maryland v. Wilson,* 519 U.S. at 415 n. 3, 117 S.Ct. at 886 n. 3.

such authority.[13]  On the other hand, the Supreme Court of Illinois has ruled that police officers do have this authority, at least when the passenger engages in sudden movement that arouses a justified fear for the officer's safety.[14]

In the present case, the State does not argue that police officers have a general authority to detain passengers at the scene of a routine traffic stop. The State does argue that Castle's actions at the scene of the traffic stop raised a reasonable fear for Officer Yamamoto's safety, but, as explained below, the record does not support the State's assertion. Therefore, like the United States Supreme Court, we expressly do not decide the question of a police officer's authority to detain passengers at the scene of a routine traffic stop for no reason other than their presence as passengers in the car.

*The State's argument that Yamamoto could stop Castle because Castle was a witness to a crime*

■ The State contends that Officer Yamamoto was authorized to stop Castle because the officer knew that Castle was a witness to a crime—Browning's crime of driving with a revoked license. In *Metzker v. State* [15] and in *Beauvois v. State* [16], this court recognized the authority of the police to "approach and stop a person for the purpose of investigating a crime even though the officer has no reason to believe that the person stopped has committed the crime which is being investigated." [17] However, the police are justified in stopping witnesses "only where exigent circumstances are present".[18]

The facts of *Beauvois* provide an illustration of the exigency required to support an investigative stop of a witness. In *Beauvois*, the police officer knew that a robbery had just occurred in the vicinity of a campground and that the robber had fled on foot toward the campground:

> The time was three o'clock in the morning, when most people are asleep. The streets leading to the campground were deserted. [The officer] saw only one vehicle moving: the Corvette leaving the campground. It was reasonable to suspect that the occupants of the Corvette had been awake in the campground when the robber came through, and that they might have seen something. Under these circumstances, and especially given the recency and the seriousness of the crime, prompt investigative efforts were justified. Even though [the officer] had no other information to link the Corvette or its occupants to the robbery, he could validly stop the car and ask its occupants if they knew anything or had seen anything that might aid [the officer]'s investigation of the crime that had just been committed.

*Beauvois,* 837 P.2d at 1121. Similarly, in *Metzker* we held that the police were justified in stopping a motor vehicle because a passenger in that vehicle was thought to be an assault victim who had just fled the police, who was intoxicated, and who was possibly in need of medical treatment.[19]

Comparing the facts of Castle's case to the facts of *Beauvois* and *Metzker,* it is clear that no exigency supported the officer's decision to detain Castle as a witness to a crime. True, Castle was a witness to the fact that Browning had been driving a car, but Browning's crime was over. Yamamoto was not investigating an ongoing or recently committed unsolved crime, as was true in *Beauvois.* Moreover, Yamamoto had personally observed the offense, had apprehended the perpetrator, and had taken him into custody. Yamamoto had no reason to believe that Castle possessed knowledge that would materially aid the investigation of Browning's

---

13. *See State v. Mendez,* 137 Wash.2d 208, 970 P.2d 722 (1999) (decided under the state constitution); *Dennis v. State,* 345 Md. 649, 693 A.2d. 1150 (1997) (decided under the federal constitution).

14. *See People v. Gonzalez,* 184 Ill.2d 402, 235 Ill.Dec. 26, 704 N.E.2d 375 (1998).

15. 797 P.2d 1219 (Alaska App.1990).

16. 837 P.2d 1118 (Alaska App.1992).

17. *Metzker,* 797 P.2d at 1221 (citation omitted).

18. *Id.* (listing cases).

19. *See Metzker,* 797 P.2d at 1220–21.

offense.[20] Nor was Yamamoto acting to ensure the health or safety of a crime victim, as was true in *Metzker*.

For these reasons, we conclude that Yamamoto's seizure of Castle can not be justified under the theory that Castle was a witness to a crime.

*The State's argument that Yamamoto could stop Castle because Castle's sudden exit from the vehicle caused Yamamoto to reasonably fear that Castle might assault him*

■ The State argues that Castle's sudden exit from Browning's vehicle caused Officer Yamamoto to reasonably fear that Castle might assault him. This fear, the State contends, justified Yamamoto in ordering Castle to remain at the scene and, when Castle disobeyed this order, it justified Yamamoto's decision to conduct an investigative stop to determine whether Castle was carrying any weapons.

We can imagine circumstances in which a passenger's sudden movements might raise a reasonable fear of imminent assault, thus justifying an officer in frisking the passenger or in ordering the passenger to remain where the officer can observe and control them. But when Castle's suppression motion was litigated in the superior court, the State did not suggest this as a justification for the investigative stop. Moreover, the record fails to support the State's assertion that Castle's actions raised a reasonable fear of imminent assault.

In the superior court, Castle's suppression motion was litigated on the pleadings; the State did not ask for an evidentiary hearing. But even judging events from the description in the State's own memorandum, the record fails to suggest that Castle's actions caused Yamamoto to fear for his safety:

As [Officer] Yamamoto was taking Browning back to the patrol car after arresting Browning, Castle got out of [Browning's car] and came to the rear of it[,] where he stated, "I need to leave." Officer Yamamoto told him to hold on just

a moment. He asked Castle to have a seat in [Browning's car] and told him that he would be right back with [him].

According to the State's trial court memorandum, Officer Yamamoto then turned his attention back to Browning. Yamamoto escorted Browning to the patrol car, placed him inside, and then "went back to contact Castle". Only then did Yamamoto realize that Castle had departed.

The State's description of events—which tracks Officer Yamamoto's testimony at the grand jury—does not suggest that Castle posed any danger to Yamamoto, nor does it suggest that Yamamoto apprehended any danger from Castle. In short, there is nothing in the record to support the State's current assertion that Yamamoto's actions were justified by concerns for officer safety.

Moreover, it must be remembered that Castle did in fact leave the scene of the traffic stop. Castle was apparently trying to put as much distance as possible between himself and the officer; the seizure occurred only after Yamamoto tracked Castle down and forcibly stopped him. By that time, any potential argument based on officer safety had lost all its force. It was Yamamoto's choice to initiate the second encounter with Castle. The State can not justify Yamamoto's seizure of Castle by arguing that Castle might have represented a potential danger to Yamamoto if both men had remained at the scene of the traffic stop.

*The State's argument that Yamamoto could stop Castle because Castle violated municipal law by running in the middle of the street*

■ Finally, the State argues that Yamamoto was justified in stopping Castle because Castle violated a Fairbanks municipal ordinance when he ran in the middle of the street.

Fairbanks General Code § 78–241 incorporates various portions of the State's highway regulations. One of these state regulations, 13 AAC 22.175(a)—(b), requires pedestrians

---

**20.** *See Model Code of Pre–Arraignment Procedure* (1975), § 110.2(1)(b). The text of this model code provision is quoted and approved in Wayne R. LaFave, *Search and Seizure* (3rd ed.1996), § 9.2(b), Vol. 4, p. 24.

walking along roadways to use a sidewalk if practicable or, if no practicable sidewalk is available, to walk on the shoulder of the road or, if there is no shoulder, to walk as near as practicable to the outside edge of the road. The State argues that Castle violated this regulation, and thus the corresponding municipal ordinance, when he ran in the middle of the street to escape Officer Yamamoto. According to the State, Castle's commission of this offense gave Yamamoto probable cause to arrest Castle, even if Yamamoto had had no justification for stopping Castle before that time.

As we explained above, when Yamamoto commanded Castle to stay in the car and not to leave the scene of the traffic stop, this amounted to a sufficient show of authority to be deemed a "seizure". And because we have rejected the State's proffered justifications for this seizure, we conclude that Yamamoto exceeded his authority when he ordered Castle to remain at the scene. When Yamamoto later located Castle and again directed him to stop and submit to questioning, the officer still had no justification for this renewed attempt to seize Castle. And it was Yamamoto's renewed attempt to seize Castle that prompted Castle to run into the street in an attempt to escape the officer.

Thus, to evaluate the State's argument, we must examine and clarify a particular aspect of the exclusionary rule: When the police violate the Fourth Amendment by unlawfully seizing or unlawfully attempting to seize a person, and the person responds by committing a crime, may the person be prosecuted for this crime notwithstanding the prior illegality? Or is the crime to be deemed a "fruit" of the police illegality, so that evidence of this crime must be suppressed?

This issue is discussed by Professors LaFave, Israel, and King in their treatise on criminal procedure.[21] According to LaFave,

courts consistently uphold the admissibility of evidence of an attempted bribe or a physical attack on the officer making the illegal seizure.[22] Courts often reach this result by asserting that a bribe or a physical attack is "sufficiently [a product] of free will to purge the taint" of the prior illegality. But LaFave describes this rationale as "not particularly satisfying, for it might be asked why the bribe offer is any more an act of free will than an incriminating admission or [an] attempt to dispose of the evidence, neither of which is *per se* untainted".[23] Instead, according to LaFave, "the answer [lies] in the underlying deterrent purpose of the exclusionary rule":

> Incriminating admissions and attempts to dispose of incriminating objects are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases. Bribery attempts [and physical attacks], by comparison, are so infrequent and unpredictable that admission of evidence of such criminal activity ... is not likely to encourage future illegal arrests and searches [.]

LaFave, § 9.4(f), Vol. 3, pp. 380–81.

This court relied on this discussion (from the first edition of the LaFave textbook) in *Napageak v. State*.[24] Napageak was charged with third-degree assault after he used a whale gun to threaten a police officer who entered his home illegally but peaceably.[25] He argued that all evidence of this assault should be suppressed because the assault was a fruit of the officer's illegal entry. But this court rejected Napageak's argument and affirmed his conviction, quoting LaFave and noting that this result "finds support in virtually every decision discussing the issue".[26]

The law has not changed in the intervening fifteen years.[27] But, as the quoted passage

---

21. Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 9.4(f), Vol. 3, pp. 380–81.

22. *See id.*

23. *Id.*

24. 729 P.2d 893 (Alaska App.1986).

25. *Napageak*, 729 P.2d at 894.

26. *Napageak*, 729 P.2d at 895 n. 2.

27. *See, e.g., Jurco v. State*, 825 P.2d 909, 914 (Alaska App.1992) (a person is not allowed to forcibly resist officers who have come to seize property under a judicial decree, and the person

from *LaFave* suggests, the policy behind the exclusionary rule may call for a different result when the defendant's crime is a predictable result of the police illegality. The following three cases illustrate this principle.

In *State v. Alexander*[28], the defendant failed to stop at a police roadblock set up to catch drunk drivers. A police officer gave chase, pulled Alexander over, and determined that he was driving under the influence of intoxicants.[29] Alexander argued that the roadblock was illegal and that all evidence resulting from his failure to stop at the roadblock should be suppressed. The lower court agreed with Alexander that the roadblock, as conducted by the police, had been illegal. But under Vermont law, it is a crime to fail to stop when signaled to do so by an identified police officer.[30] Because Alexander violated this law, the lower court upheld the police officer's stop of Alexander's car and the admissibility of the resulting evidence of his intoxication.

The Vermont Supreme Court acknowledged the cases holding that defendants are not entitled to suppression of evidence that they engaged in assaults or other life-threatening behavior (*e.g.*, embarking on a high-speed chase) in response to an illegal search or seizure.[31] But the court concluded that if failing to stop at the direction of a police officer "[were] to be treated as a 'distinct' crime, ... the goal of the exclusionary rule, controlling police misconduct, [would] not be served."[32] If a person who attempted to avoid an unlawful roadblock had no recourse to the exclusionary rule, then

> [p]olice could be less fastidious in establishing roadblocks or could even make random stops of drivers on less than probable cause, and when drivers failed, for whatever reason, to stop, any evidence gathered at the illegal stop could not be suppressed. The exclusionary rule requires more, and the state cannot pass a statute that effectively eviscerates a constitutional doctrine by "curing" an illegal police action. *Alexander*, 595 A.2d at 285.

In *People v. Felton*[33], a police officer tried to illegally restrain the defendant as he walked along the street. When Felton started to run away, the police officer grabbed his arm. In response, Felton struck the police officer in the face and again tried to get away. He was quickly subdued and arrested. During the ensuing search of Felton's person, the police found several packets of cocaine, and he was charged with possession of cocaine, resisting arrest, and assault.[34]

The New York Court of Appeals held that Felton was entitled to suppression of the evidence against him. The court upheld the lower court's finding that Felton's action in striking the officer was "immediate, spontaneous, and proportionate to the officer's [unlawful] attempt to lay hands on him[.]"[35] Thus, according to the New York high court, the taint of the officer's initial illegal attempt to restrain Felton carried over to Felton's ultimate arrest and the subsequent seizure of contraband from his person.[36]

The New York Court of Appeals reached a similar result in *People v. Cantor*.[37] Cantor was returning home at 3 o'clock in the morning when he was surrounded by three plainclothes police officers who did not identify themselves. Cantor drew a pistol and pointed it at the officers, but he put the weapon away when one of the officers showed his badge. It turned out that the police did not have sufficient justification for stopping Cantor, but it also turned out that Cantor did not

can be prosecuted for crimes arising from their use of force).

28. 157 Vt. 60, 595 A.2d 282 (1991).

29. *Alexander*, 595 A.2d at 283.

30. *Alexander*, 595 A.2d at 284.

31. *Alexander*, 595 A.2d at 285.

32. *Id.*

33. 78 N.Y.2d 1063, 576 N.Y.S.2d 89, 581 N.E.2d 1344 (1991)

34. *Felton*, 576 N.Y.S.2d 89, 581 N.E.2d at 1344–45.

35. *Felton*, 576 N.Y.S.2d 89, 581 N.E.2d at 1345.

36. *See id.*

37. 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975).

have a permit for his handgun, so he was charged with a violation of the New York firearms laws.[38]

Cantor argued that, because the police had had no reason to stop him, the court should suppress all evidence relating to his possession of the handgun. The Court of Appeals agreed. Implicitly adopting the view that Cantor had acted reasonably—and therefore had committed no assault—when he pulled his gun on the three unidentified men who surrounded him in the middle of the night, the court ruled that all evidence stemming from the illegal investigative stop should be suppressed.[39]

Although we have discussed *Alexander, Felton,* and *Cantor* in some detail, we do not necessarily endorse the results in those cases. To a large extent, the proper result in a particular case will depend upon the facts of that case. But we do endorse the principle espoused by *LaFave* and employed by the courts in *Alexander, Felton,* and *Cantor.* When a defendant commits a crime in response to an illegal search or seizure, the policy of the exclusionary rule—society's interest in deterring police misconduct—must govern any decision whether to admit or suppress evidence of the defendant's crime.

As this court held in *Napageak,* the exclusionary rule does not bar evidence of the defendant's responsive crime when that crime is an assault on an officer making a peaceable, albeit unlawful, entry. But the facts of Castle's case are considerably different. Castle did not attack Officer Yamamoto. Rather, he ran down the middle of the street at 3:30 in the morning in an attempt to get away from the officer.

One of the major aims of the exclusionary rule is to deter the police from engaging in the unlawful detention or restraint of our citizens. Society's interest in deterring unlawful arrests and investigative stops would be ill-served if the police could unlawfully seize (or try to seize) someone, only to later

justify themselves by proving that the victim of this unlawful seizure ran into the street, or crossed against a red light, or jaywalked, or trespassed by running across municipal park land when it was closed, or littered by throwing contraband to the ground. In such instances, "[the] defensive action by the victim can fairly be characterized as having been brought about by exploitation [of the illegal conduct]."[40] This being so, courts should apply the exclusionary rule to deter the police from future similar misconduct.

In Castle's case, we conclude that even if Castle broke the law by running into the middle of the street, his conduct was the direct result of Officer Yamamoto's unjustified attempt to seize him. We further conclude that the policy of the exclusionary rule would be undermined if we allowed Castle's conduct to form the justification for his ensuing arrest and the search of his person.

*Conclusion*

The record does not support the State's arguments that Castle could be temporarily detained at the scene of the traffic stop, either because he was a witness to a crime or because he posed a potential threat to officer safety. And we hold, as a matter of law, that Castle's act of running into the street, in apparent violation of state and municipal law, can not form the justification for his arrest and the search of his person. Accordingly, the cocaine found on Castle's person must be suppressed.

When Castle entered his no contest plea, the State conceded that it had no case if this evidence was suppressed. The judgement of the superior court is therefore REVERSED.

COATS, Chief Judge, dissenting.

I agree with the majority that Officer Gary A. Yamamoto had no legal basis to detain Castle merely because Castle was a witness.[1] Since Officer Yamamoto had personally observed Browning's offense, Officer Yama-

---

**38.** *Cantor,* 365 N.Y.S.2d 509, 324 N.E.2d at 875.

**39.** *Cantor,* 365 N.Y.S.2d 509, 324 N.E.2d at 878.

**40.** LaFave, *Criminal Procedure, supra,* note 21, p. 381.

**1.** *See* 4 Wayne R. LaFave, Search and Seizure § 9.2(b), at 24 (3d ed.1996).

moto had no basis to believe that Castle was an important witness. But I disagree with the majority that the record in this case establishes that Officer Yamamoto conducted an illegal investigative stop.

The record in this case is very limited. The parties agreed to have District Court Judge Sigurd Murphy decide this issue based upon the grand jury testimony of Officer Yamamoto. According to Officer Yamamoto's testimony, after he placed Browning under arrest, he took Browning back to his patrol car. As he was taking Browning back to the patrol car, the passenger, Donald L. Castle, got out and stated, "I need to leave." Officer Yamamoto responded, "Well, hold on just a moment. Why don't you have a seat in the car. I'll be right back with you." Officer Yamamoto continued back towards his patrol car, pat searched Browning, placed him inside the patrol car, then returned to Browning's vehicle. Castle was no longer there.

Officer Yamamoto went inside the Mapco station and asked the clerk if he knew where the passenger (Castle) had gone. The clerk told Officer Yamamoto that Castle had come in through the front door and then gone out the side door. Officer Yamamoto went back to the patrol car and drove around the neighborhood, hoping to find Castle. After spotting Castle walking on the sidewalk down 23rd Street, Officer Yamamoto pulled up to him and stated, "Sir, I need to talk to you for just a moment." At that point Castle started running. Castle ran "out into the middle of the road, right in front of [the] patrol car . . . and down 23rd [Street]."

Judge Murphy concluded that, up to this point, no seizure had occurred. He found that the seizure occurred when Yamamoto activated his overhead lights and later pushed Castle into the snow. The majority concludes that Officer Yamamoto violated Castle's rights when he asked him to remain at the scene for a moment and later when he recontacted him and stated, "Sir, I need to talk to you for just a moment." I agree with Judge Murphy and disagree with the majority.

Castle was in Browning's car and was a witness to a crime. It was reasonable for Officer Yamamoto to attempt to identify Cas-

tle and to obtain a statement from him. It would be unprofessional and foolish for Officer Yamamoto to fail to take these steps. As I have previously stated, however, I agree with the majority that Castle was not an important enough witness to justify ordering him to stay. But, I agree with Judge Murphy's finding that Officer Yamamoto did not order Castle to stay. According to Officer Yamamoto's testimony, the only evidence we have before us, he politely requested that Castle stay. I fail to see that this request was an infringement of Castle's rights. After Castle left the scene, Officer Yamamoto attempted to contact Castle in order to complete his investigation. Again, I agree with Judge Murphy's finding that Officer Yamamoto did not violate Castle's rights by driving up to him and stating, "Sir, I need to talk to you for just a moment." I fail to see why Officer Yamamoto could not contact Castle to attempt to interview him as a witness. In addition, I fail to see how Officer Yamamoto could approach Castle in a less intrusive manner than he did.

The majority hinges its decision on the conclusion that Officer Yamamoto violated Castle's Fourth Amendment rights by his attempts to interview Castle. The majority concludes that because Officer Yamamoto violated Castle's rights, "that even if Castle broke the law by running in the middle of the street, his conduct was the direct result of Officer Yamamoto's unjustified attempt to seize him." I disagree that Officer Yamamoto violated Castle's rights, thereby justifying Castle's illegal conduct.

According to Officer Yamamoto's testimony, after he told Castle, "Sir, I need to talk to you for just a moment," Castle "ran out into the middle of the road right in front of my patrol car and started running [in the middle of the road] down 23rd." Yamamoto chased Castle, and ultimately managed to stop him, finding drugs. According to Judge Murphy's findings, "Castle began running into and down the middle of the street. He continued this behavior which created an imminent threat to his own safety and possibly the safety of other drivers for several blocks." The state argues that Castle's behavior of running down the street violated

the law which requires a pedestrian to walk on a sidewalk, or, in the absence of a sidewalk, to walk on the edge of the roadway.[2] The state concedes that Officer Yamamoto did not use this justification for the stop and Judge Murphy did not rely on this justification either. But the state points out that there is authority which would permit us to independently uphold the trial court's decision in spite of the fact that this theory was never advanced in the trial court.[3] I am not sure it would be fair to uphold the trial court's decision on this basis because the record is so limited and the parties did not focus on this issue in the trial court. Castle had a right to refuse to talk to Officer Yamamoto and to walk away. I doubt that Officer Yamamoto could stop Castle for something as minor as a jaywalking violation. However, if Castle's actions were more serious and there was a significant independent ground for stopping him, I see no basis for suppression. Since I conclude that the record, findings, and briefing in this case are inadequate to resolve this issue, I would remand to allow the parties to focus on these issues.

---

**2.** In pertinent part, 13 Alaska Administrative Code (AAC) 02.175 provides:

(a) Where a sidewalk is provided and its use is practicable, a pedestrian may not walk upon an adjacent roadway except when crossing the roadway.

(b) Where a sidewalk is not available, a pedestrian walking upon a highway shall walk on a shoulder as far as practicable from the edge of the roadway. Where neither a sidewalk nor a shoulder is available, a pedestrian walking on a highway shall walk as near as practicable to the outside edge of the highway and, if walking along a two-way roadway, shall walk only on the left side of the roadway.

Fairbanks General Code Ordinance (FGCO) § 78.241 incorporates this provision.

**3.** *McGee v. State*, 614 P.2d 800, 805–06 n. 10 (Alaska 1980); *Snider v. State*, 958 P.2d 1114, 1117–18 (Alaska App.1998).