**STATE of Alaska, Appellant,**

v.

**David Scott CAMPBELL, Appellee.**

**No. A–9729.**

Court of Appeals of Alaska.

Dec. 19, 2008.

**21.** Op. at 1153–54.

**22.** 822 P.2d at 918 n. 8.

**23.** Op. at 1153.

**24.** *Pratt & Whitney Canada, Inc. v. Sheehan,* 852 P.2d 1173, 1176 (Alaska 1993).

**25.** *Id.*

**26.** Op. at 1151.

W.H. Hawley, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellant.

Frederick T. Slone, Kasmar and Slone, P.C., Anchorage, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

*OPINION*

STEWART, Judge.

A University of Alaska police officer stopped a vehicle as it turned off Benson Boulevard into a store's parking lot because the vehicle did not have its headlights illuminated. The officer mistakenly believed that the vehicle was operating in violation of 13 AAC 04.010(a)(1), the regulation that requires a vehicle to have headlights illuminated one-half hour after sunset. In fact, sunset had occurred less than fifteen minutes beforehand.

The officer activated his patrol car's emergency lights. Instead of stopping, David Scott Campbell drove through the parking lot, across Northern Lights Boulevard, finally stopping off the road and leaving his vehicle. The officer arrested him shortly thereafter.

The State indicted Campbell for first-degree eluding a police officer.[1] The State also added four misdemeanor charges by informa-

---

1. AS 28.35.182(a).

tion: driving while under the influence,[2] resisting or interfering with arrest,[3] fifth-degree criminal mischief,[4] and improper use of registration or title.[5]

Campbell moved to suppress, arguing that he was illegally stopped. Superior Court Judge John E. Suddock held an evidentiary hearing on the motion and suppressed the State's evidence. We uphold the superior court's ruling for the reasons below.

### Background facts and proceedings

University of Alaska Anchorage (UAA) Police Officer Scott Chafin testified that he contacted a dispatcher on June 4, 2005, at about 11:00 p.m. to find out "what time sunset was." He recalled that the dispatcher informed him that sunset was "somewhere around" 10:26 p.m.

Officer Chafin went to the University Center on Old Seward Highway to perform a security check of the UAA premises there. He left the area around 11:20 p.m. He then stopped a car on New Seward Highway for not having its headlights on. After concluding the stop with a verbal warning, Chafin stopped another car for not having its headlights illuminated. Campbell's vehicle was the third that Chafin intended to stop for not having its headlights illuminated.

When Officer Chafin turned on his emergency lights, Campbell was turning from Benson Boulevard into the Fred Meyer parking lot. Campbell did not stop but drove across the parking lot as Officer Chafin followed with his lights and siren activated. Campbell drove over the curb on the north side of the parking lot, across the four lanes of Northern Lights Boulevard, and over the curb on the north side of Northern Lights Boulevard, where he stopped. When Chafin stopped his patrol car, Campbell got out of his vehicle and ran to the fence.

2. AS 28.35.030(a)(1).

3. AS 11.56.700(a)(1).

4. AS 11.46.486(a).

5. AS 28.10.481.

The State presented no evidence on why dispatch provided Officer Chafin with faulty sunset information. Although the University Police Department had a system to record radio traffic, the system was apparently inoperative.

Judge Suddock found that the State failed to establish that the misinformation about the time of sunset resulted from "excusable neglect." Judge Suddock also found no evidence that Cambell had endangered anyone, put anyone at risk, or engaged in any outrageous conduct. He granted the motion to suppress, primarily relying on *Castle v. State.*[6]

The State moved for reconsideration and asked to present additional evidence. Judge Suddock denied reconsideration, pointing out that the State's motion failed to discuss his analysis of the evidence, which found that Campbell had a brief failure to stop followed by a minor traffic offense with no attendant risk to the public.

The State then filed a "supplemental" motion for reconsideration, again asking to re-open the evidentiary hearing to present additional evidence. Judge Suddock allowed the State to recall Officer Chafin for additional testimony.

At the conclusion of Officer Chafin's additional testimony, Judge Suddock found that Campbell's driving as he turned into the parking lot from Benson Boulevard did not arouse suspicion. He found that Campbell accelerated up to thirty miles per hour in the lot and then slowed down before going across the four lanes of Northern Lights Boulevard and stopping on the sidewalk. He found that no other vehicle had to take evasive action and that no third party was subjected to any risk by Campbell's driving. Judge Suddock ruled that Campbell was subjected to an illegal stop. He further ruled that Campbell's conduct, a direct response to the illegal stop, did not create a risk of danger to third

6. 999 P.2d 169, 174–76 (Alaska App.2000) (holding that the exclusionary rule barred the State from relying on a municipal pedestrian control ordinance to justify a police officer's arrest of a witness who ran from the officer on the street in violation of the ordinance after the police officer illegally seized the witness).

persons even though Campbell violated the law. Accordingly, he suppressed the State's evidence.

### Discussion

The State first argues that Officer Chafin's attempt to stop Campbell was valid because the officer reasonably believed that he observed a traffic violation and acted in good faith in stopping Campbell. Essentially, the State argues that Chafin had probable cause to believe that Campbell was violating 13 AAC 04.010(a)(1) because his headlights were off.[7] The State also attacks several of Judge Suddock's factual findings.

 Whether an officer has probable cause for a traffic stop is a mixed question of fact and law.[8] We view the evidence in the light most favorable to the trial court's ruling and overturn the court's factual findings only if we are convinced that the findings are clearly erroneous.[9] We review de novo whether the historical facts found by the trial court establish probable cause.[10]

 For an officer to have probable cause, the officer must have reasonably trustworthy information sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed.[11]

 Officer Chafin's information on the time of sunset was wrong. In the superior court, the State stipulated that on June 4, 2005, sunset occurred at approximately 11:25 p.m. Judge Suddock found that the range of error between the actual sunset (11:25 p.m.) and the time of sunset Officer Chafin said dispatch provided to him went beyond "excusable neglect."

We interpret Judge Suddock's decision to mean that he found that Officer Chafin's

belief concerning the time of sunset was unreasonable. The record amply supports Judge Suddock's finding.

Officer Chafin testified that he called his dispatcher around 11:00 p.m. to ask when sunset was. As we have explained, the parties stipulated that sunset that day (June 4, 2005) was at 11:25 p.m. In other words, the sun was above the horizon for almost half an hour after Officer Chafin spoke to his dispatcher.

According to Officer Chafin, his dispatcher told him that the sun had already set—that sunset had occurred "somewhere around" 10:26 p.m. (In the State's memorandum to the trial court, the State asserted that Chafin believed that sunset occurred at 10:24 p.m. or 10:26 p.m.) But Chafin himself testified that the evening of June 4th was a "very nice" evening and that the streetlights had not yet been turned on when he made the traffic stop of Campbell some thirty minutes later.

We also take judicial notice that, in the spring of 2005, the last time that the sun set as early as 10:26 p.m. was on May 9th—almost four weeks before the stop in this case.[12]

For all of these reasons, the record supports Judge Suddock's finding that, if Officer Chafin believed that the sun had set more than thirty minutes before he turned on his emergency lights and siren, Chafin's belief was unreasonable. Therefore, Chafin's actions in directing Campbell to stop constituted an illegal seizure.

 We next turn to the issue of whether the exclusionary rule bars evidence of Campbell's violations after the illegal seizure. In *Castle*, the defendant was a passenger in a

---

7. 13 AAC 04.010(a)(1) provides:

 Every vehicle traveling on a highway or other vehicular way or area within the state must illuminate lights ... between one half hour after sunset and one half hour before sunrise[.]

8. *Chandler v. State*, 830 P.2d 789, 792 (Alaska App.1992).

9. *State v. Wagar*, 79 P.3d 644, 650 (Alaska 2003).

10. *Id.*

11. *Schmid v. State*, 615 P.2d 565, 574 (Alaska 1980); *State v. Grier*, 791 P.2d 627, 631 (Alaska App.1990).

12. *See* http://www.timeanddate.com (follow "The World Clock–Time Zones" hyperlink; then follow "Anchorage" hyperlink; the "Find sunrise and sunset-times for other dates" hyperlink); *see* http://stardate.org (select "Stargazing" column and follow "Sunrise & Sunset" hyperlink; then follow "Anchorage" hyperlink; then select "Pacific Standard" and "Go to Step 3").

vehicle stopped by the police who walked away from the scene of the stop after the officer ordered him to remain and wait to be interviewed.[13] The officer chased, caught, and subdued Castle.[14] A search of Castle's pockets yielded several baggies of cocaine.[15] The State argued that even if the officer had no justification for ordering Castle to stay at the scene to be interviewed, Castle's violation of a municipal ordinance by running in the street during his flight gave the officer grounds to arrest him.[16]

We rejected the State's argument and held as follows:

> When a defendant commits a crime in response to an illegal search or seizure, the policy of the exclusionary rule—society's interest in deterring police misconduct—must govern any decision whether to admit or suppress evidence of the defendant's crime.[17]

Although the discussion of this principle in *Castle* referred to the application of the exclusionary rule as enforcing "Fourth Amendment" rights, in *Joseph v. State*,[18] we recognized that *Castle* necessarily rested on state law grounds because, in *California v. Hodari D.*,[19] the United States Supreme Court held that the Fourth Amendment was not violated in the situation presented in *Castle*.[20]

We analyzed three cases from other jurisdictions in *Castle: State v. Alexander*,[21] *People v. Felton*,[22] and *People v. Cantor*.[23] In each of those cases, the court applied the exclusionary rule to suppress evidence of a defendant's crime occurring after the police unlawfully attempted to seize the defendant.[24]

The circumstances in *Alexander* parallel this case closely. When Alexander failed to stop at a roadblock designed to catch intoxicated drivers, an officer gave chase, pulled Alexander over, and arrested him for driving under the influence of intoxicants.[25] The trial court refused to suppress the evidence because Alexander failed to stop at the direction of the police officer.[26]

The Vermont Supreme Court recognized that defendants are not normally entitled to suppression of evidence that they assaulted police officers or engaged in life-threatening behavior, such as an attempt to escape at high speed in response to an illegal search or seizure.[27] But the court recognized that if the defendant's conduct in failing to stop was treated as a distinct crime not subject to the exclusionary rule, "the goal of the exclusionary rule, controlling police misconduct, [would] not be served."[28] The Vermont court therefore held that Alexander did not forfeit his right to litigate the illegal seizure claim.[29]

In this case, Judge Suddock considered *Castle* and compared the facts in Campbell's case to those in *Alexander*. Judge Suddock found that Campbell's actions were a direct response to the illegal stop. The judge recognized that Campbell did not immediately stop, but continued driving away from Officer Chafin for up to eight seconds and for a distance of approximately one hundred yards. He found that no other vehicle had to take evasive action and that no third party

---

13. *Castle,* 999 P.2d at 170–71.

14. *Id.* at 174–75.

15. *Id.* at 177.

16. *Id.* at 170–71.

17. *Id.* at 171.

18. 145 P.3d 595 (Alaska App.2006).

19. 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

20. *Joseph,* 145 P.3d at 604.

21. 157 Vt. 60, 595 A.2d 282 (1991).

22. 78 N.Y.2d 1063, 576 N.Y.S.2d 89, 581 N.E.2d 1344 (1991).

23. 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975).

24. *Castle,* 999 P.2d at 176–77.

25. *Alexander,* 595 A.2d at 283.

26. *Id.* at 284.

27. *Id.* at 285.

28. *Id.*

29. *Id.* at 283.

was subjected to any risk by Campbell's driving or failure to stop.

Although application of the exclusionary rule allows Campbell to evade responsibility for his misconduct, Judge Suddock could reasonably conclude that society's interest in prosecuting Campbell was outweighed by the interest of deterring police misconduct and maintaining judicial integrity that follows from application of the exclusionary rule. We uphold Judge Suddock's decision to suppress the evidence.

*Conclusion*

The judgment of the superior court is AFFIRMED.

COATS, Chief Judge, dissenting.

University of Alaska Anchorage Police Officer Scott Chafin initiated a traffic stop of the defendant, David Scott Campbell, for violating the regulation prohibiting driving without headlights more than thirty minutes after sunset.[1] But when Officer Chafin activated his overhead lights, Campbell turned his van into the Fred Meyer parking lot and sped up noticeably. Chafin activated his siren. He estimated Campbell's speed through the parking lot to be 40–45 miles per hour. Judge Suddock concluded that it was "equally conceivable" that Campbell's speed was 30 miles per hour.

According to Officer Chafin, he realized that Campbell was going to jump his vehicle over the curb at the edge of the parking lot and flee west on Northern Lights Boulevard. Chafin concluded that pursuing Campbell was too dangerous. He stopped and turned off his overhead lights and siren. But after jumping the curb onto Northern Lights Boulevard, Campbell drove across all four lanes of traffic and up on the adjacent sidewalk. Then Campbell jumped out of the van and attempted to climb a nearby fence. As Campbell climbed, one of the boards broke

free from the fence and he fell to the ground. Campbell then broke additional boards from the fence and ran into the back yard of the adjacent home. The homeowner quickly tackled Campbell. Officer Chafin then arrested Campbell. Campbell told Chafin that he was a commercial airline pilot and had been drinking.

The State indicted Campbell for failure to stop at the direction of a peace officer in the first degree,[2] a class C felony. The State also charged Campbell with several misdemeanor offenses, including driving while under the influence and resisting arrest.

Campbell filed a motion to suppress, arguing that Officer Chafin had attempted an illegal stop and that all the evidence of Campbell's subsequent actions had to be suppressed since they were caused by Chafin's illegal action. Following evidentiary hearings at which only Officer Chafin testified, Judge Suddock granted Campbell's motion to suppress. He found that Officer Chafin's conduct in attempting to stop Campbell for the headlight violation was not justified. He concluded that, in fleeing, Campbell had not endangered anyone to a greater extent than he had before the stop, and therefore all of the evidence against Campbell had to be suppressed.

The majority upholds Judge Suddock's ruling. But I conclude that this ruling is inconsistent with the long-established law of the Alaska Supreme Court.

The decision in this case is governed by state constitutional law. In *California v. Hodari D.*,[3] the United States Supreme Court held that evidence that the police obtained while a person was fleeing from unlawful police detention was not subject to the exclusionary rule.[4] But in *Joseph v. State*,[5] we rejected *Hodari D.* as a matter of state constitutional law.[6]

In *Miller v. State*,[7] decided almost forty years ago, the Alaska Supreme Court con-

---

**1.** 13 Alaska Administrative Code 04.010(a)(1).

**2.** AS 28.35.182(a).

**3.** 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

**4.** *Id.* at 629, 111 S.Ct. at 1552.

**5.** 145 P.3d 595 (Alaska App.2006).

**6.** *Id.* at 596.

**7.** 462 P.2d 421 (Alaska 1969).

cluded that a person who is subjected to a peaceful unlawful arrest has no right to physically resist that arrest.[8] The rule at common law was that a person was privileged to use reasonable force to prevent an unlawful arrest.[9] But the supreme court concluded that, as a policy matter, the remedy for a person who was subjected to an illegal arrest was to sue the officer for false arrest rather than to resist with force.[10]

The court set out several reasons for its decision:

> The legality of a peaceful arrest may frequently be a close question. It is a question more properly determined by courts than by participants in what may be a highly emotional situation. Because officers will normally overcome resistance with necessary force, the danger of escalating violence between the officer and the arrestee is great. What begins as an illegal misdemeanor arrest may culminate in serious bodily harm or death.[11]

The court went on to say:

> We feel that the legality of a peaceful arrest should be determined by courts of law and not through a trial by battle in the streets. It is not too much to ask that one believing himself unlawfully arrested should submit to the officer and thereafter seek his legal remedies in court. Such a rule helps to relieve the threat of physical harm to officers who in good faith but mistakenly perform an arrest, as well as to minimize harm to innocent bystanders. The old common law rule has little utility to recommend it under our conditions of life today. We hold that a private citizen may not use force to resist peaceful arrest by one he knows or has good reason to believe is an authorized peace officer performing his duties, regardless of whether the arrest is illegal.... [12]

It seems to me that the reasoning of *Miller* applies in this case. First, it is almost impossible for a driver to determine whether an officer is making an illegal stop. An officer can legally stop a driver for numerous things, including equipment violations such as a burned-out taillight or an obscured license plate. Therefore the supreme court's observation in *Miller* that a citizen will frequently not know whether an arrest is legal or illegal is even more compelling in the case of a traffic stop. Furthermore, a person who is subjected to an illegal arrest faces a much greater intrusion into his personal liberty than does a person who is subjected to an illegal traffic stop. But most importantly, it seems to me that the act of fleeing from a traffic stop is more dangerous to the person fleeing, the officer, and innocent bystanders than the act of resisting an arrest. A person fleeing in an automobile is fleeing in what can easily become a dangerous and deadly weapon. It seems reasonable to assume that the person who is fleeing from the officer will be paying attention to the pursuing officer rather than to his driving. Therefore, a person fleeing from the police almost invariably puts innocent members of the public in danger. Once Campbell started to flee, Officer Chafin almost immediately stopped his pursuit in compliance with the local policy in this jurisdiction and many others. This policy is based upon the conclusion that pursuing suspects who are fleeing from the police is exceptionally dangerous. Yet if the suspect commits a sufficiently dangerous act in fleeing from the police, the police can then make a lawful arrest.[13]

You also have to question why someone would flee from a traffic stop. Is this something we really want to encourage? In the present case we have a good idea why Campbell fled. He was a commercial airline pilot and he had been drinking, apparently enough to result in a charge of driving while under the influence. He was concerned that being

---

**8.** *Id.* at 426–27.

**9.** 5 Am.Jur.2d *Arrest* § 89 (2008); Jeffrey F. Ghent, Annotation, *Modern Status of Rules as to Right to Forcefully Resist Illegal Arrest*, 44 A.L.R.3d 1078, § 2(a) (1972).

**10.** *Miller*, 462 P.2d at 426.

**11.** *Id.*

**12.** *Id.* at 427.

**13.** 3 Wayne R. LaFave, et al., *Criminal Procedure* § 9.4(f), at 464–66 (3d ed. 2007).

caught by the police would affect his commercial pilot's license.

Therefore, it seems to me that the policy set out in the majority opinion tends to encourage suspects to flee and the police to pursue. We are not talking about doing away with the exclusionary rule. Had Campbell stopped, all of the evidence against him would have been suppressed. All of the charges against Campbell arose from his illegal, and potentially dangerous, act of fleeing from the police. As I have pointed out, the evidence that arose from his attempt to elude the traffic stop would be admissible under federal law. Why would we want to interpret the Alaska Constitution to encourage this behavior? The decision by the Alaska Supreme Court in *Miller* points the way. When a police officer initiates a traffic stop, the sensible thing for the citizen to do is to pull over and submit to the stop, rather than flee. Why would we want to send any other message? I conclude that Campbell's motion to suppress should have been denied.