**Claude J. JOSEPH, Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. A–8939.**

Court of Appeals of Alaska.

Oct. 13, 2006.

---

David D. Reineke, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Diane L. Wendlandt, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and David W. Márquez, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and STEWART, Judges.

## OPINION

MANNHEIMER, Judge.

Claude J. Joseph was convicted of third-degree controlled substance misconduct (possession of cocaine with intent to distribute it).[1] The police obtained the primary evidence against Joseph (*i.e.,* the cocaine) when the police chased, caught, and detained Joseph in connection with their investigation of another offense: use of marijuana in a public place.[2]

This appeal presents two main questions.

First, did the police have lawful grounds for chasing Joseph—that is, lawful grounds for attempting to subject Joseph to an investigative stop? Under the Alaska Constitution, as construed by our supreme court in *Coleman v. State,* 553 P.2d 40 (Alaska 1976), the police may conduct an investigative stop if they have a reasonable suspicion that the person being stopped is committing, or has just committed, a crime involving imminent public danger or recent serious harm to persons or property. Did the facts known to the police when they commenced their efforts to detain Joseph satisfy the *Coleman* test?

Second, if the police did not have lawful grounds for chasing Joseph, should this Court apply the exclusionary rule to suppress the fruits of that unlawful chase?

In *California v. Hodari D.,* 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991), the Supreme Court held that the exclusionary rule does not apply to evidence that the police obtain while a person is fleeing from an impending unlawful police detention. The Supreme Court held that the exclusionary rule only applies to evidence that the police obtain after they *succeed* in unlawfully seizing a person. Because Joseph tossed the cocaine to the ground in the sight of the police while the police were chasing him, before the police actually caught and subdued him, we must decide whether to adopt the interpretation of the exclusionary rule espoused by the Supreme Court in *Hodari D.,* or instead join the dozen states that have rejected *Hodari D.* on state law grounds.

For the reasons explained here, we conclude that the police, when they began to chase Joseph, did not have grounds for subjecting him to an investigative stop. We further conclude that we should reject *California v. Hodari D.* as a matter of state constitutional law. We therefore conclude that Joseph is entitled to suppression of the evidence that the police obtained as a result of chasing him.

*Underlying facts*

In the early evening of May 16, 2003, a person called 911 in Anchorage to report that

---

1. AS 11.71.030(a)(1).

2. AS 11.71.060(a)(1), as limited by *Noy v. State,* 83 P.3d 538, 543 (Alaska App.2003), *rehearing denied* 83 P.3d 545 (Alaska App.2003).

two men were walking down the street, smoking a "joint" (*i.e.*, a marijuana cigarette). The caller said that the two men were black, that they were wearing dark clothing, and that they were walking near the intersection of Thompson Avenue and Taylor Street in Mountain View.

Anchorage Police Officer Charles Reynolds was on patrol about four blocks away, and he received a dispatch to investigate this report. Driving westbound on Thompson Avenue, Officer Reynolds observed two black men, both wearing dark clothing, standing at the intersection of Schodde Street and Tarwater Avenue. (This location is one block south and one block west of the intersection of Taylor Street and Thompson Avenue.) The two men were standing next to a Ford minivan, and they were chatting with two women.

Reynolds stopped his patrol car about fifteen feet from the Ford van. He intended to obtain the two men's identities and then issue them citations for public use of marijuana (a class B misdemeanor).[3]

When Reynolds got out of his vehicle, he did not see any of the four people holding a marijuana cigarette. Nevertheless, Reynolds directed the man closest to him to approach the patrol car. As this man began to move toward him, Reynolds smelled a strong odor of marijuana coming from the area where the four people were standing, although it was impossible to tell whether this odor was emanating from any particular person.

When the man got close to him, Reynolds informed the man that he was investigating a complaint that two men were smoking marijuana in that area. The man did not physically resist Reynolds but, according to Reynolds, the man was "on the verge" of becoming "verbally ... non-compliant", so Reynolds decided to place the man in handcuffs for purposes of officer safety.

While Reynolds was placing this first man in handcuffs, the second man—Claude Joseph—began walking away. Reynolds called out for Joseph to stop, but Joseph continued walking away. Joseph had his hands in his pockets as he walked away, and Reynolds directed Joseph to take his hands out of his pockets, but Joseph continued to walk away with his hands in his pockets.

At that same time, a member of the Mountain View Community Patrol arrived on the scene and offered to watch the first man while Officer Reynolds pursued Joseph. Freed from the task of supervising the first man, Reynolds again called out to Joseph, directing him to stop. In response, Joseph began to run. Reynolds gave chase, continuing to yell for Joseph to stop.

Reynolds began to gain on Joseph. When Reynolds was almost within arm's reach, Joseph reached into his pocket and tossed away a plastic baggie containing a white chalky substance, about the size of a golf ball. The baggie landed on a patch of grass. Joseph continued to run, and Reynold continued to chase Joseph. Eventually, Joseph doubled back to the area where he had discarded the baggie, and there he stopped running. Reynolds caught Joseph, handcuffed him, and placed him under arrest.

While all of this was going on, the first man (the one who had been left in the custody of the Community Patrol) fled the scene. This man was never identified.

The baggie that Joseph had tossed away was found to contain twenty individually wrapped rocks of cocaine weighing a total of approximately thirteen grams. Based on this evidence, Joseph was indicted for third-degree controlled substance misconduct.

Following his indictment, Joseph asked the superior court to suppress the cocaine found in the plastic baggie. He argued that this evidence was the fruit of an unlawful seizure of his person.

Superior Court Judge Larry D. Card concluded that, given the circumstances of Joseph's case, Officer Reynolds had a reasonable suspicion that Joseph had just been smoking marijuana in public. Judge Card further concluded that the use of marijuana in a public place constituted an "imminent public danger"—thus justifying an investigative stop under the rule announced by the Alaska Supreme Court in *Coleman v. State*, 553 P.2d 40, 43 (Alaska 1976).

---

**3.** AS 11.71.060(b).

*Even though Officer Reynolds may have had a reasonable suspicion that Joseph had just been smoking marijuana in public, the public use of marijuana is not an "imminent public danger" for purposes of the Coleman rule*

In *Terry v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the United States Supreme Court held that, consistent with the Fourth Amendment to the United States Constitution, police officers may briefly detain people to investigate a potential crime even though the officers do not have probable cause to make an arrest. The Supreme Court held that a brief investigative detention is justified if the police have an objectively "reasonable suspicion" of criminal activity—that is, if the police can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant th[e] intrusion".[4]

In two decisions that pre-dated *Terry*, the Alaska Supreme Court had upheld brief investigative detentions, based on less than probable cause, in situations where the police had reasonable suspicion that "imminent public danger exist[ed]" or that the person being detained had "recently [caused] serious harm".[5] And in *Coleman*, when the Alaska Supreme Court was asked to re-assess the legality of investigative stops in light of the United States Supreme Court's decision in *Terry*, the Alaska Supreme Court re-affirmed this limitation on investigative stops.

■ Under *Coleman*, reasonable suspicion that a person is committing or has committed a crime is not enough, by itself, to justify an investigative stop. Rather, the suspected crime must create an imminent danger to the public, or it must involve recent serious harm to persons or property. *Coleman*, 553 P.2d at 46.

In footnote 17 of the *Coleman* opinion (553 P.2d at 45), the supreme court expressed its concern that an open-ended rule for investigative stops would pose a danger of "serious and unintended erosion" of the constitutional protection against unreasonable searches and seizures. Based on this concern, our su-

preme court declared that "the doctrine of stop and frisk enunciated in *Terry* should not be extended beyond situations requiring immediate police response to protect the public in serious cases where there is a likelihood of imminent danger about to occur or where serious harm has recently been perpetrated [on] persons or property."

■ In Joseph's case, Officer Reynolds had a reasonable suspicion that Joseph and his companion had been smoking a marijuana cigarette just before Reynolds arrived on the scene. It is also possible (although we do not decide this) that Reynolds had a reasonable suspicion that one of these two men might still be carrying marijuana on his person. But *Coleman* requires that the suspected criminal activity pose an imminent danger to the public safety or that it involve recent serious harm to persons or property. The use or possession of a marijuana cigarette on a public street does not meet this test.

The State points out that this Court upheld an investigative stop in *Pooley v. State*, 705 P.2d 1293 (Alaska App.1985), when the suspected crime was possession of marijuana for purposes of distribution or sale. But as we carefully pointed out in *Pooley*, the *Coleman* test was met because the police had an "amply support[ed] suspicion that Pooley had [just] transported substantial quantities of illegal drugs a long distance for commercial purposes, not just that he possessed small quantities of illegal drugs for personal use." *Pooley*, 705 P.2d at 1307.

We then explained why we concluded that the transportation of controlled substances for the purpose of unlawful commercial distribution met the *Coleman* requirements for an investigative stop:

> The illegal trafficking of controlled substances is a major problem in Alaska. The lucrative profits to be made from illegal drug sales have attracted an increasingly high level of criminal activity, and widespread distribution of illegal drugs poses a serious danger to the health and safety of many potential users, especially among

---

4. *Terry*, 392 U.S. at 21–22, 88 S.Ct. at 1880.

5. *See Goss v. State*, 390 P.2d 220 (Alaska 1964), and *Maze v. State*, 425 P.2d 235 (Alaska 1967).

school-age children. Most controlled substances sold illegally in Alaska are imported from outside the state, often by persons acting as drug couriers. We believe the public, as well as the police, have a vital interest in assuring that illegal drug traffic is detected and curtailed before illicit drugs are actually placed into distribution in Alaska. *Compare Hubert v. State,* 638 P.2d 677, 685–86 (Alaska App.1981) (even though crime actually being investigated was relatively minor felony of receiving and concealing stolen property, connection of the stolen property with recent burglary, coupled with high police interest in recovering proceeds of a theft before they are placed in the chain of illegal distribution and dispersed, justifies conclusion that *Coleman* standard was met).

*Pooley,* 705 P.2d at 1307.

Based on this analysis, we concluded that if the police had a reasonable suspicion that Pooley was a commercial drug courier, this was tantamount to reasonable suspicion that his conduct posed an imminent danger to public safety—and, therefore, the investigative stop satisfied the *Coleman* test. *Id.*

But in an accompanying footnote (footnote 9), we echoed the supreme court's concern that, unless limits were placed on law enforcement's authority to conduct investigative stops based on reasonable suspicion, the doctrine of investigative stops might "become [a] vehicle for serious and unintended erosion" of the constitutional protections against unlawful searches and seizures. *Pooley,* 705 P.2d at 1307 n. 9. In particular, we warned that our decision in *Pooley* should not be viewed as authorizing investigative stops based on the suspicion that a person is in possession of a small quantity of a controlled substance in a non-commercial context:

> A situation in which [the] police have a reasonable suspicion that a person is transporting illegal drugs for eventual distribution in [this] state is clearly distinguishable from a situation in which [the] police suspect that an individual is in possession of a small quantity of an illegal drug or have no reason to believe that distribution is contemplated. The latter situation raises the spectre of routine stop-and-frisk procedures [whose primary object is to conduct a search].

*Id.*

Joseph's case presents the latter situation described in *Pooley:* the possession of small quantities of illegal drugs in a non-commercial context. Officer Reynolds suspected Joseph of using a small amount of marijuana in a public place-and, conceivably, possessing a small amount of marijuana in a public place for personal use. Our decision in *Pooley* does not support an investigative stop under these circumstances. Rather, *Pooley* strongly suggests that the investigative stop in Joseph's case does not meet the *Coleman* test for "imminent public danger".

The State also relies on our decision in *State v. G.B.,* 769 P.2d 452 (Alaska App. 1989), where we adopted and applied a "flexible approach" to the *Coleman* requirement of "recent serious harm to persons or property".

The issue in *G.B.* was whether a state trooper was justified in briefly detaining a juvenile suspected of shoplifting a videotape minutes before. On appeal, the juvenile argued that, as a matter of law, the theft of a single videotape did not qualify as "recent serious harm to property". This Court disagreed; we ruled that, depending on the circumstances, a brief detention might be justified to investigate even a minor theft. We declared that, "[w]hile the theoretical seriousness of the [suspected] crime ... is a significant factor ..., it is not in itself determinative":

> *Coleman* speaks in terms of imminent threats to public safety and recently committed serious harm. In so doing, *Coleman* recognizes that the extent of danger threatened by a potential crime or the seriousness of harm resulting from a crime that has already been committed cannot be evaluated in the abstract. Rather, a threat to public safety must be considered in conjunction with the imminence of that threat. A given threat to public safety might not justify an investigative stop when the danger threatened is not immediate and when circumstances would permit additional efforts to obtain probable cause. As the

danger becomes more immediate and the opportunity for additional investigation diminishes, the same threat might justify a stop based on reasonable suspicion alone. Likewise, once a crime has been committed, the seriousness of the resulting harm must be considered in connection with the recency of the crime. The less recent the crime, the more serious the offense must be before an investigative stop based on reasonable suspicion alone will be justified.

These factors must in turn be balanced against the strength of an officer's reasonable suspicion and the actual intrusiveness of the investigative stop. The seriousness of harm necessary to support an investigative stop will thus increase or diminish in any given case depending on the totality of the circumstances surrounding the stop itself. A minimally intrusive stop based on solid information indicating that a crime is actually in progress or has just been completed may be justified under *Coleman* even when the crime itself is not a felony and involves harm that in other contexts might not seem particularly serious.

*G.B.*, 769 P.2d at 455–56.

In *Gibson v. State*, 789 P.2d 383, 384 (Alaska App.1990), applying this "flexible" approach to *Coleman's* "recent serious harm to property" test, we upheld the brief investigative detention of a person suspected of vandalizing a pay telephone minutes before.

Based on our decisions in *G.B.* and *Gibson*, the State argues that Officer Reynolds could justifiably conduct an investigative stop of Joseph even though Joseph's suspected offense was *de minimis*. We conclude that this would be an improper expansion of *G.B.'s* flexible approach to *Coleman*.

True, *G.B.* and *Gibson* stand for the proposition that the phrase "recent serious harm to property" should be interpreted flexibly, so as to allow a brief detention to investigate a relatively minor property offense if the offense is recent enough, the need for immediate police action is apparent, and the detention is sufficiently limited.

But *G.B.* and *Gibson* both involved real (albeit relatively minor) harm to someone's property. In *G.B.*, it was theft of a video-tape; in *Gibson*, vandalism of a pay telephone. These cases do not stand for the proposition that *Coleman's* requirement of "recent serious harm to persons or property" can be interpreted so "flexibly" as to completely eliminate the words "harm to persons or property".

Officer Reynolds had no reason to suspect that Joseph posed an imminent danger to anyone's safety, and no reason to suspect that Joseph had recently caused harm to any person or property. Thus, our decisions in *G.B.* and *Gibson* do not support the investigative stop in Joseph's case.

For these reasons, we hold that the investigative stop in this case violated the Alaska Constitution as interpreted in *Coleman*.

■ At two places in the State's brief (pages 9 and 20), the State mentions in passing that Officer Reynolds may have had probable cause to arrest Joseph for smoking marijuana in public. If Reynolds had lawful justification for arresting Joseph when he began to chase him, this would allow the State to escape the *Coleman* strictures on investigative stops.

It is unclear whether the State is seriously advancing this argument—because, at yet another place in the State's brief (page 22), the State suggests that there was no probable cause to arrest Joseph until he tossed away the baggie of cocaine. However, even assuming that the State is offering this as an alternative rationale for upholding the trial court's ruling, we reject the State's argument.

Reynolds arguably had probable cause to believe that Joseph had just been smoking a marijuana cigarette in public. Joseph fit the description given by the 911 caller, Joseph was in the location described by the caller, and Reynolds could smell the odor of burning marijuana coming from the area where Joseph, the other man, and the two women were standing. But under Alaska law (with certain exceptions that are not pertinent here), even though a police officer has probable cause to believe that a person has committed a misdemeanor offense, the officer is prohibited from arresting the person for that offense unless (a) the officer has an arrest

warrant or (b) the misdemeanor is committed in the officer's presence. AS 12.25.030–12.25.035.

Reynolds had no warrant to arrest Joseph, so the validity of any arrest hinged on whether Joseph's act of smoking marijuana in public occurred in Reynolds's presence. Although the evidence in this case may have strongly suggested that Joseph had been smoking a marijuana cigarette in public just prior to Reynolds's arrival on the scene, there was no evidence that Joseph continued to commit this offense in the officer's presence. Accordingly, Reynolds had no authority to arrest Joseph for this suspected offense.

This point of law is explained in Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 5.1(c), Vol. 3, pp. 30–32:

> [Although it] is generally accepted that an officer may utilize all of his senses in determining whether a misdemeanor is occurring[,] ... [i]t must be emphasized ... that it is not enough that the officer relies upon his own senses in determining that an offense *has* occurred; the offense must be occurring while the policeman is on the scene. Thus, an officer may not make [a warrantless] arrest for a misdemeanor battery merely because he has been told by the victim that the defendant, [who is] still present, struck her prior to the arrival of the police, and this is so even though [the victim's] story is largely corroborated by the officer's observation of her [physical] condition. Likewise, [a warrantless] arrest may not be made for the misdemeanor of driving under the influence of intoxicating liquor when an officer comes on the scene of an auto accident and finds the defendant there, even though the defendant is obviously intoxicated and admits that he had been driving the vehicle.

As we explained earlier, the State's "argument" of this point consists of a couple of

isolated and conclusory assertions about the existence of probable cause. Given the evidence in this case, and given the established law on this point, it appears that the State's argument is meritless.

*The Alaska Constitution requires suppression of evidence obtained by the police as a result of an attempt to conduct an unjustified investigative stop*

■■■ While the police were chasing him, Joseph took out the plastic baggie containing the cocaine and threw it to the ground. This action might be viewed as an abandonment of the cocaine. However, as this Court noted in *Young v. State*, 72 P.3d 1250, 1255 (Alaska App.2003), "[a]cts of abandonment prompted by unlawful police conduct are generally considered the tainted fruit of the illegality." [6] Thus, because Joseph threw away the cocaine in response to police efforts to unlawfully seize him (that is, police efforts to subject him to an unlawful investigative stop), the cocaine would be viewed as the tainted fruit of the police misconduct.

But, as we pointed out at the beginning of this opinion, the United States Supreme Court has ruled that the exclusionary rule does *not* apply to situations like the one in Joseph's case—situations where a suspect throws away or otherwise reveals physical evidence while the police are *attempting* to unlawfully seize the suspect, before the police actually accomplish the unlawful seizure. *California v. Hodari D.*, 499 U.S. 621, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

The facts of *Hodari D.* are quite similar to the facts of Joseph's case. A pair of police officers on patrol saw a group of four or five youths huddled around a car that was parked at the curb of a street. As the police car approached, the youths began to run away. Believing that the youths' behavior was "suspicious", the two officers gave chase—one in the patrol car, and one on foot. The police

---

**6.** Citing *Cox v. State*, 586 So.2d 1321, 1322 (Fla. App.1991) (holding that when the defendant's act of abandoning or dropping a package of marijuana was prompted by or was the result of an illegal stop, the purported abandonment could not be used to justify a warrantless search); *State v. Belton*, 441 So.2d 1195, 1199 (La.1983)

("When police officers make an investigatory stop without the legal right to do so, property abandoned or otherwise disposed of as a result thereof cannot be legally seized."); *Comer v. State*, 754 S.W.2d 656, 659 (Tex.App.1986) (abandonment must occur "independent of any police misconduct").

officer on foot began running after Hodari D.. When the officer was almost upon him, Hodari D. "tossed away what appeared to be small rock". Moments later, the officer tackled Hodari D. and handcuffed him. The "small rock" proved to be crack cocaine.[7]

The California Court of Appeal ruled that the police had no justification for chasing Hodari D., and the court further ruled that Hodari D. had been "seized" when the police officer gave chase. Thus, the court concluded, the exclusionary rule required suppression of the cocaine that Hodari D. threw away during the chase.[8]

The United States Supreme Court accepted the California court's ruling that the police had no justification for chasing Hodari D.. Nevertheless, the Supreme Court declared that the California court had committed error when it suppressed the cocaine—because the Fourth Amendment protects only against unreasonable "seizures", and Hodari D. had not been seized until after he threw away the cocaine in the sight of the police. Justice Scalia, writing for the majority, explained:

> [T]he Fourth Amendment's protection against "unreasonable ... seizures" includes seizure of the person. [But from] the time of the founding [of this country] to the present, the word "seizure" has meant a "taking possession" [citations to various dictionaries omitted]. For most purposes at common law, the word connoted not merely grasping, or applying physical force to, the [person or] object in question, but actually bringing it within physical control.
>
>    . . .
>
> The narrow question before us is whether, with respect to a show of authority [by the police], a seizure occurs even though the subject does not yield. We hold that it does not.
>
>    . . .
>
> [When] a policeman yell[s] "Stop, in the name of the law!" at a fleeing [person who] continues to flee[, there] is no seizure.

*Hodari D.,* 499 U.S. at 624, 626, 111 S.Ct. at 1549–1550.

Justice Scalia then declared that this result was fully consistent with the policy of the exclusionary rule—that is, the policy of deterring police misconduct by depriving the government of the evidence obtained through that misconduct:

> [Public] compliance with police orders to stop should ... be encouraged. Only of a few of those orders, we must presume, will be without adequate basis.... [Moreover, unlawful] orders will not be deterred ... by [applying] the exclusionary rule [to] those of them that are *not* obeyed. Since policemen do not command "Stop!" expecting to be ignored, or give chase hoping to be outrun, it fully suffices to apply the deterrent [of the exclusionary rule solely] to ... successful seizures.

*Hodari D.,* 499 U.S. at 627, 111 S.Ct. at 1551.

Based on *Hodari D.,* the State asserts that no Fourth Amendment violation occurred in Joseph's case because (1) there was no seizure of Joseph's person until the police actually succeeded in subduing him, and (2) by that time, the police had probable cause to arrest Joseph-because Joseph had thrown the baggie of cocaine to the ground in Officer Reynolds's sight. In other words, the State argues that no Fourth Amendment violation preceded Joseph's act of throwing the cocaine to the ground, and thus the cocaine should be deemed "abandoned property" (*i.e.,* admissible evidence) rather than the fruit of police illegality.

The State acknowledges that *Hodari D.* was decided on federal law grounds and that, "[t]o date, [the] Alaska courts have not yet [expressly] ruled on whether the *Hodari* [*D.*] standard will apply under the Alaska Constitution". However, the State contends that this Court implicitly endorsed *Hodari D.* when we decided *Castle v. State,* 999 P.2d 169 (Alaska App.2000).

In *Castle,* the defendant walked away from a police officer after the officer unjustifiably ordered the defendant to remain at the scene of a traffic stop and wait to be interviewed.

---

**7.** *Hodari D.,* 499 U.S. at 623, 111 S.Ct. at 1549.

**8.** *Id.*

The officer chased Castle, and he eventually caught Castle and subdued him. A subsequent search of Castle's pockets yielded several small bags of cocaine.[9]

In our analysis of these facts, we concluded that the police officer's "request" for Castle to stop and be interviewed was, in fact, a directive—a show of authority: "a reasonable person in Castle's position would believe that the officer was ordering him to stop and submit to questioning."[10] We then declared:

> At that point, a seizure occurred—or, more precisely, a seizure would have occurred had Castle followed the officer's instruction. As it happened, Castle ignored the officer's order. The actual seizure occurred a few moments later when [the officer] chased after Castle, blocked his path with the patrol vehicle, and wrestled him to the ground.

*Castle*, 999 P.2d at 172.

The State points out that our analysis of this point—*i.e.*, our analysis of what constitutes a "seizure"—is the same analysis that the United States Supreme Court adopted in *Hodari D.*. This is true. However, despite our agreement with the Supreme Court about what constitutes a "seizure", we differed with the Supreme Court on the key issue in the case: whether the exclusionary rule should apply to this situation.

In *Castle*, the State argued that even if the police initially had no justification for ordering Castle to remain at the scene and be interviewed, Castle's later actions gave the police grounds to arrest him—because, while Castle was fleeing from the police, he violated municipal law by running in the middle of a street.[11] We held that even if this was true, the exclusionary rule precluded the State from relying on Castle's violation of municipal law as a ground for arresting him—because Castle's action was a direct response to the officer's attempt to unlawfully detain Castle:

[T]o evaluate the State's argument, we must examine and clarify a particular aspect of the exclusionary rule: When the police violate the Fourth Amendment by unlawfully seizing or unlawfully attempting to seize a person, and the person responds by committing a crime, may the person be prosecuted for this crime notwithstanding the prior illegality? Or is the crime to be deemed a "fruit" of the police illegality, so that evidence of this crime must be suppressed?

This issue is discussed by Professors LaFave, Israel, and King in their treatise on criminal procedure.[12] According to *LaFave*, ... "the answer [lies] in the underlying deterrent purpose of the exclusionary rule":

> Incriminating admissions and attempts to dispose of incriminating objects are common and predictable consequences of illegal arrests and searches, and thus to admit such evidence would encourage such Fourth Amendment violations in future cases....

*LaFave*, § 9.4(f), Vol. 3, pp. 380–81.

*Castle*, 999 P.2d at 175.

We then discussed three cases from other states—*State v. Alexander*, 157 Vt. 60, 595 A.2d 282 (1991); *People v. Felton*, 78 N.Y.2d 1063, 576 N.Y.S.2d 89, 581 N.E.2d 1344 (1991); and *People v. Cantor*, 36 N.Y.2d 106, 365 N.Y.S.2d 509, 324 N.E.2d 872 (1975)—in which courts applied the exclusionary rule to suppress evidence that was the fruit of unlawful police *attempts* to detain the defendant.[13]

Following our discussion of these three cases, we stated:

[Although] we do not necessarily endorse the results in [these] cases, ... we do endorse the principle espoused by *LaFave* and employed by the courts in *Alexander*, *Felton*, and *Cantor*. When a defendant commits a crime in response to an illegal search or seizure, the policy of the exclu-

---

9. *Castle*, 999 P.2d at 170–71.

10. *Id.* at 172.

11. *Id.* at 174–75.

12. Wayne R. LaFave, Jerold H. Israel, and Nancy J. King, *Criminal Procedure* (2nd ed.1999), § 9.4(f), Vol. 3, pp. 380–81.

13. A detailed explanation of these three cases is contained in *Castle*, 999 P.2d at 176–77.

sionary rule—society's interest in deterring police misconduct—must govern any decision whether to admit or suppress evidence of the defendant's crime.

*Castle*, 999 P.2d at 177.

We then explained why suppression of evidence in cases like *Castle*—that is, suppression of evidence obtained by the police as the result of their unlawful attempt to detain a citizen—served the underlying goals of the exclusionary rule:

> One of the major aims of the exclusionary rule is to deter the police from engaging in the unlawful detention or restraint of our citizens. Society's interest in deterring unlawful arrests and investigative stops would be ill-served if the police could unlawfully seize (or try to seize) someone, only to later justify themselves by proving that the victim of this unlawful seizure ran into the street, or crossed against a red light, or jaywalked, or trespassed by running across municipal park land when it was closed, or littered by throwing contraband to the ground. In such instances, "[the] defensive action by the victim can fairly be characterized as having been brought about by exploitation [of the illegal conduct]." [*LaFave*, § 9.4(f), Vol. 3, p. 381.] This being so, courts should apply the exclusionary rule to deter the police from future similar misconduct.
>
> In Castle's case, we conclude that even if Castle broke the law by running into the middle of the street, his conduct was the direct result of [the officer's] unjustified attempt to seize him. We further conclude that the policy of the exclusionary rule would be undermined if we allowed Castle's conduct to form the justification for his ensuing arrest and the search of his person.

*Castle*, 999 P.2d at 177 (text of accompanying footnote inserted in brackets).

Our decision in *Castle* can rightly be criticized in one respect: we consistently referred to Castle's rights under the "Fourth Amendment", but we never acknowledged the United States Supreme Court's decision in *Hodari D..* That is, we never acknowledged the fact that the Supreme Court had already ruled that the Fourth Amendment is not violated under the circumstances presented in *Castle*.

If we are to continue to follow the rule that we announced in *Castle*—that is, if we are to continue to apply the exclusionary rule to suppress the fruits of unlawful police *attempts* to detain citizens—then we must do so as a matter of state law.

In this, we would not be alone. Courts in more than a dozen states have already expressly rejected *Hodari D.* as a matter of state law:

> *See State v. Oquendo*, 223 Conn. 635, 613 A.2d 1300, 1309–1310 (1992); *Flonnory v. State*, 805 A.2d 854, 857 (Del.2001); *State v. Quino*, 74 Haw. 161, 840 P.2d 358, 362 (1992); *Baker v. Commonwealth*, 5 S.W.3d 142, 145 (Ky.1999); *State v. Tucker*, 626 So.2d 707, 712 (La.1993); *Commonwealth v. Stoute*, 422 Mass. 782, 665 N.E.2d 93, 96 (1996); *Matter of Welfare of E.D.J.*, 502 N.W.2d 779, 781 (Minn.1993); *State v. Clayton*, 309 Mont. 215, 45 P.3d 30, 34 (2002); *State v. Beauchesne*, 151 N.H. 803, 868 A.2d 972, 978–981 (2005); *State v. Tucker*, 136 N.J. 158, 642 A.2d 401, 405 (1994); *People v. Hollman*, 79 N.Y.2d 181, 581 N.Y.S.2d 619, 626–27, 590 N.E.2d 204, 211–12 (1992); *State v. Puffenbarger*, 166 Or.App. 426, 998 P.2d 788, 792–94 (2000); *Commonwealth v. Matos*, 543 Pa. 449, 672 A.2d 769, 775 (1996); *State v. Randolph*, 74 S.W.3d 330, 336–37 (Tenn.2002); *State v. Young*, 135 Wash.2d 498, 957 P.2d 681, 687 (1998).
>
> *See also* Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 9.4(d), Vol. 4, p. 456, where the author declares that the result reached in *Hodari D.* is "incorrect", and that the decision in *Hodari D.* is "aptly characterized ... as [a] manifestation of the [Supreme] Court's surreal and Orwellian view of personal security in contemporary America".[14]

---

**14.** Quoting Ronald J. Bacigal, "The Right of the People to be Secure", 82 Ky. L.J. 145, 146 (1993).

We agree with these other states that the United States Supreme Court has adopted an interpretation of the Fourth Amendment and the exclusionary rule that fails to adequately safeguard our citizens' right to privacy, that fails to adequately protect citizens from unwarranted government intrusion, and that unjustifiably reduces the incentive of police officers to honor citizens' constitutional rights. As we stated in *Castle,* when the police, whether by physical force or by show of authority, undertake to restrain the freedom of a citizen, the principles of the exclusionary rule apply equally regardless of whether the police succeed in unlawfully seizing the person or merely attempt to do so.

We therefore reject the decision in *Hodari D.* as inconsistent with Article I, Section 14 of the Alaska Constitution—the provision that guarantees "[t]he right of the people to be secure in their persons ... and property ... against unreasonable searches and seizures".

*Conclusion*

We conclude that Officer Reynolds acted illegally when he attempted to detain Joseph at the scene by a show of authority, and when he chased Joseph after Joseph fled rather than obeying the officer's command to stay. We further conclude that, under the Alaska Constitution, Joseph's act of tossing away the baggie of cocaine is the fruit of this illegality, and the cocaine must be suppressed.

We acknowledge that our decision means that Joseph will escape criminal liability for his conduct—his possession of a significant quantity of cocaine that was divided into some twenty smaller packages, apparently for sale. But as the Wyoming Supreme Court noted in *Damato v. State,* 64 P.3d 700, 710 (Wyo.2003), few decisions involving the law of search and seizure vindicate the rights of innocent people.

As Justice Felix Frankfurter said, the "safeguards of liberty have frequently been forged in controversies involving not very nice people." *United States v. Rabinowitz,* 339 U.S. 56, 69, 70 S.Ct. 430, 436, 94 L.Ed. 653 (1950) (Frankfurter, J., dissenting). When we perform our duty to interpret the search and seizure clause of our state constitution, and to enforce the exclusionary rule, we are obliged to ignore Joseph's apparent guilt and to focus, instead, on the legality or illegality of the police actions that led to the discovery of the evidence.

The judgement of the superior court is REVERSED.