Donald BRAND, Appellant,

v.

STATE of Alaska, Appellee.

No. A–9844.

Court of Appeals of Alaska.

April 3, 2009.

Marjorie Allard, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant.

Nancy R. Simel, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

## OPINION

BOLGER, Judge.

Alaska State Trooper Elizabeth Haddad secured Donald Brand and Gretchen Smith outside of their home after a violent confrontation. Kenai Police Sergeant Gus Sandahl then discovered a marijuana-growing operation as he walked through the house to determine whether there was anyone else inside. But the police may not enter a home for a protective sweep unless they have a reasonable belief that there is an individual inside the residence who could put them in danger. We therefore conclude that the superior court should have suppressed the fruits of this illegal search.

## I. BACKGROUND

On August 2, 2004, Trooper Elizabeth Haddad was dispatched to the Brand residence to support a welfare check for a possibly suicidal woman. When Haddad arrived at the home, paramedics were already treating Gretchen Smith with oxygen in the back of an ambulance. After speaking with Haddad, Smith became agitated and ran into the home.

Haddad attempted to pursue Smith into the house, but was then confronted by Donald Brand at the front door. Brand told Haddad to leave his property. During this encounter, Smith twice emerged from the house: at one point she threatened Haddad with a large bulldog, and at another she brandished a knife. Haddad felt that Brand was causing a distraction and told him to put his hands behind his back so that she could handcuff him. When Brand refused, Haddad drew her taser. Haddad fired, unfortunately striking Brand in the groin. After this occurred, she handcuffed him and the paramedics took him to their ambulance for treatment.

Meanwhile, Kenai Police Sergeant Gus Sandahl and Officer Mitch Langseth were informed by dispatch that a trooper was requesting emergency assistance. Sandahl and Langseth proceeded to the Brand residence with their patrol vehicle's lights and sirens activated. While en route, the officers re-

ceived information that Trooper Haddad had used her taser on an individual at the scene.

When the Kenai officers arrived at the scene, Donald Brand and his brother, James Brand, were outside of the home while Smith was still inside. Donald Brand was secured in the ambulance and James Brand was wandering around, but not bothering anyone. Sandahl thought that Smith might have barricaded herself in the home, so he went to his patrol car to retrieve his patrol rifle. However, by the time Sandahl returned with his rifle, Haddad was already securing Smith outside of the home.

Haddad then informed Sandahl that she smelled marijuana, and Langseth suggested that Sandahl perform a protective sweep. The officers had James Brand secure his dog (which was inside the house) and then Sandahl walked through the residence. When Sandahl reached the upstairs portion of the house, he discovered a marijuana-growing operation of more than forty plants.

Trooper Mark Pearson arrived after Sandahl completed the protective sweep. After learning of the marijuana discovery, Pearson confronted Brand about the marijuana and asked for his consent to search the house. Brand initially refused to consent, but ultimately assented when Trooper Pearson told Brand that he would obtain a warrant. Officers then seized the plants and equipment.

Brand was later indicted on three counts of fourth-degree misconduct involving a controlled substance.[1] Brand filed a pretrial motion to suppress the State's evidence—arguing that the protective sweep was illegal and that the subsequent consent to search was tainted. Superior Court Judge Charles T. Huguelet denied the motion, ruling that the protective sweep was proper and that the consent was voluntary.

After proceeding to trial, Brand was convicted of two counts of fourth-degree miscon-

duct involving a controlled substance.[2] These two counts merged for the purposes of his sentencing, and on November 22, 2006, Superior Court Judge John E. Suddock sentenced Brand to 4 years' imprisonment on this merged count.

## II. DISCUSSION

In his denial of Brand's motion to suppress, Judge Huguelet ruled that "Sergeant Sandahl reasonably believed there may be other individuals in the residence [who] posed a threat to police and paramedics." On appeal, Brand again argues that the protective sweep was unjustified because there was no basis for Sandahl to believe that there was anyone in the house. We review the trial court's factual findings for clear error, but we independently decide whether those facts constitute an illegal warrantless search.[3]

### A. The Protective Sweep of Brand's Residence Was Not Justified.

"A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others."[4] Such a "sweep lasts no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises."[5] For such a search to be permissible, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."[6]

Under Alaska law, "[t]o satisfy the protective search doctrine, the state must prove that: '(a) the officers must have reasonable cause to believe that their safety is in danger before engaging in such a search, and (b) the search must be narrowly limited to

---

1. AS 11.71.040(a)(3)(G), AS 11.71.040(a)(3)(F), and AS 11.71.040(a)(5).

2. AS 11.71.040(a)(3)(G) and AS 11.71.040(a)(3)(F).

3. See Hilbish v. State, 891 P.2d 841, 848 (Alaska App.1995).

4. Maryland v. Buie, 494 U.S. 325, 327, 110 S.Ct. 1093, 1094, 108 L.Ed.2d 276 (1990).

5. Id. at 335–36, 110 S.Ct. at 1099.

6. Id. at 334, 110 S.Ct. at 1098.

areas where they could find dangerous persons.'"[7] To establish such reasonable cause, the State must "'demonstrate a factual basis for a reasonable belief that additional suspects [beyond those under police control] were present and posed a threat to the safety' of the officers."[8]

### The Superior Court's Decision

Based on the evidence presented at the hearing, Judge Huguelet concluded that Sandahl believed that there could be other individuals in the residence who posed a threat to the police and paramedics:

> Sergeant Sandahl arrived at the Brand residence to back up Trooper Haddad after the situation at the Brand house had become dangerous. Donald Brand was belligerent enough [that] Trooper Haddad felt it necessary to shoot him with a taser. Ms. Smith had threatened Trooper Haddad with a knife and a bulldog. Donald Brand seemed to be aggressively supporting Ms. Smith. Trooper Haddad could smell marijuana from the porch.

From these findings, the judge concluded that the threatening nature of the situation caused Sandahl to be concerned that there might be others in the Brand residence:

> The environment [Sandahl] arrived to find at the Brand residence was threatening. Sergeant Sandahl saw the need to arm himself with an assault rifle. Donald Brand's and Gretchen Smith's reactions to Trooper Haddad reasonably caused Sergeant Sandahl to be concerned [that] more people might be in the house who posed a danger to police and paramedics. The scope of the search was narrow. The sweep was not a pretext for a search for drugs.

Accordingly, Judge Huguelet ruled that Sandahl had reasonable cause to believe that there were other individuals in the home who may have posed a threat to the officers' safety. However, we conclude that there was insufficient testimony at the evidentiary hearing to suggest that Sandahl had reason to believe that there were others inside the home.

### The Officers' Testimony

Haddad and Sandahl both testified that they did not have any reason to believe that there was anyone in the home. Sergeant Sandahl—the officer who performed the sweep—testified that both Smith and Brand were secured outside the residence prior to his entry to conduct the sweep. Sandahl further testified that he did not remember anyone telling him that there were any additional persons inside, that he was unable to see anyone else inside, and that he "did not know if there was anyone else in the residence." When asked if he had specific information that there was anyone else inside of the house, Sandahl testified that he "did not have information that there was anyone else in the house," but qualified that statement with the explanation that "[a]t any point, there could be ... anyone anywhere." When asked if he knew of any threats to the officers, Sandahl testified that "something had happened that caused Trooper Haddad to taze one of the individuals." Sandahl could not recall whether he was aware if anyone had been threatened by Smith's dog.

Trooper Haddad's testimony on this point is consistent with Sandahl's. Haddad testified that she did not know if anyone else was inside of the house. She testified that she did not tell Sergeant Sandahl to perform a protective sweep and did not know why he did so. Haddad agreed that before Sandahl conducted the protective sweep, Brand was secured in the ambulance. Smith was also secured, and James Brand was wandering around outside. Haddad also testified that she did not know if anyone else was inside of the house.

Thus, neither Haddad nor Sandahl had any actual belief that there was someone within the home who posed any threat. More importantly, Sandahl specifically testified that he did not have any information supporting a belief that there was anyone else in the home. Judge Huguelet's conclusion that

---

**7.** *Earley v. State,* 789 P.2d 374, 376 (Alaska App. 1990) (quoting *Murdock v. State,* 664 P.2d 589, 596 (Alaska App.1983)).

**8.** *Murdock,* 664 P.2d at 596 (quoting *State v. Spietz,* 531 P.2d 521, 525 (Alaska 1975)).

Sandahl believed there were others in the house is simply not supported by the record.

*The Other Circumstances*

The State argues that the protective sweep was justified by the nature of the events at the Brand residence. In support of this claim, the State points to the facts that "Trooper Haddad was facing a situation involving a potentially violent suicidal individual who had threatened her with *both* an attack by a large, aggressive dog and a knife," and that Brand was "aggressive and threatening, and ... appeared to be intentionally diverting the trooper's attention from the subject who was reportedly suicidal and violent."

 As Professor LaFave notes, there are indeed situations "where the arresting officers are not possessed of concrete information tending to show that other persons are presently in the premises entered, [but the] dominant consideration is the seriousness of the criminal conduct for which the arrest was made, considering all the known circumstances."[9] For example, when police are making arrests in particularly dangerous areas or are arresting violent criminals,[10] are responding to reports of gunfire,[11] have come under fire,[12] or are arresting inherently dangerous individuals involved in the drug trade,[13] protective sweeps may be justified despite uncertainty of whether a residence contains any other individuals.

 Such reasoning appears to be consistent with the Alaska rule that the protective sweep exception to the warrant requirement is applicable when "the officers had reasonable cause to believe that their safety was in danger because additional suspects—beyond those under police control—were present and posed a threat to the officers...."[14] For example, officers were justified in sweeping a residence in *Maness v. State* where they responded to a shooting and found a victim lying in a pool of blood.[15] In that case, even though the officers did not have concrete facts to indicate that there was someone other than the arrestee within the building, the sweep was proper because of earlier reports of a crazy man with a shotgun and because of an earlier shooting incident.[16]

But the instant case does not present the sort of serious situation addressed in the examples above. Rather than investigating a serious crime, the officers were originally called to the scene to conduct a welfare check on a possibly suicidal individual. Although Smith did threaten Haddad with a knife and a dog, her threats were not tied into a broader pattern of violence that would still present a threat to officer safety after she was secured. Notwithstanding Smith's threats to Trooper Haddad or Brand's aggressiveness, such behavior would not lead a reasonable police officer to believe that other armed confederates were present within the house.

*The Presence of the Dog*

The State also argues that the presence of a vicious dog "is a factor that may be considered in evaluating the potential danger and whether a protective sweep is necessary." Here, the State's argument is not that the

---

**9.** 3 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment*, § 6.4(c), at 377 (4th ed.2004).

**10.** *See United States v. Burrows*, 48 F.3d 1011, 1017 (7th Cir.1995) (holding that because officers were making an arrest in a particularly violent area, and because the arrestees were suspected of committing a violent crime involving a firearm and were allegedly planning to control the local drug trade, the sweep was justified because the officers were especially concerned for their safety).

**11.** *See United States v. Caraza*, 843 F.2d 432, 435–36 (11th Cir.1988); *United States v. Riccio*, 726 F.2d 638, 643 (10th Cir.1984).

**12.** *See State v. McCurry*, 587 S.W.2d 337, 340 (Mo.App.1979).

**13.** *See United States v. Castillo*, 866 F.2d 1071, 1080–81 (9th Cir.1988) (upholding sweep because officers testified that they knew of cocaine dealers' propensities to carry weapons and resort to violence).

**14.** *Maness v. State*, 49 P.3d 1128, 1131 (Alaska App.2002); *see also Spietz*, 531 P.2d at 525; *Earley*, 789 P.2d at 376; *Murdock*, 664 P.2d at 596.

**15.** *Maness*, 49 P.3d at 1131.

**16.** *Id.*

officers were concerned about some unidentified third party who could use the dog to attack others, but rather that Smith could have escaped the officers' custody, opened the door to the residence, and released the dog. In support of these arguments, the State relies on *Teer v. State*[17] and *United States v. Bernard.*[18] However, both cases are distinguishable from this one.

In *Teer*, officers were stationed around a residence to arrest a "serious violent felon" on a warrant.[19] After the suspect was led out of the house and arrested on the porch, police conducted a protective sweep of the residence.[20] The appellate court found that the sweep was proper because "[t]he evidence addressed at trial showed that there were five other adults in the home.... [And p]olice officers also heard a dog barking, which turned out to be a pit bull."[21] Although the court does not go into detail about the presence of the dog, it does not appear that the mere presence of a dog independently justified the protective sweep.

In *Bernard*, police conducted a raid on a location after aerial surveillance revealed fields of marijuana.[22] While investigating fields in the area in the past, the officers encountered many traps, including "ankle and neck-high trip wires, barbed wire stretched across paths at eye level, pit-falls, steel traps, electric fences, and guard dogs."[23] When the officers were unable to locate persons whom they had spotted from the air, they conducted a protective sweep of the defendant's curtilage, where the officers discovered drying marijuana in plain view.[24] The appellate court held that the protective sweep was justified—basing its conclusion "upon the officers' prior experience in securing other marihuana fields; their encounter with the neighbor's Doberman Pinscher; the recently harvested marihuana; the value and commercial nature of the crop; and [the] appellant's evasive response to [an officer's] question inquiring about the whereabouts of the missing person, which was inconsistent with what the officers had seen from the air."[25]

In neither case did the courts find the presence of a dog sufficient to independently warrant a protective sweep. The presence of a vicious dog is one factor that could support an inference that people within a home could be a threat, at least when considered in tandem with facts supporting the belief that other people are inside. The presence of a dog alone, however, does not satisfy the requirement that police have a reasonable belief that other individuals are present in the home who pose a threat to officer safety.

### The Officers Were Outside the Home Before They Started the Protective Sweep.

A special consideration that applies to this case is that the arrest of Brand and Smith occurred outside of their residence. In many of the cases reviewing protective sweeps, the sweep at issue took place after police officers already entered a residence to effect an arrest.

In *State v. Spietz*, the Alaska Supreme Court noted the special constitutional protection for the home: "A door of the home represents a firm constitutional barrier whether or not it is open."[26] In that case, the supreme court held that the officers' entry into a home to conduct a protective sweep was unjustified even though the suspect was wanted for assault with a dangerous weapon and had been observed with what was suspected to be marijuana in plain view through his front door.[27] Without "a factual

17. 738 N.E.2d 283 (Ind.Ct.App.2000).

18. 757 F.2d 1439 (4th Cir.1985).

19. *Teer*, 738 N.E.2d at 286.

20. *Id.*

21. *Id.* (citing *Reed v. State*, 582 N.E.2d 826, 828 (Ind.Ct.App.1991)).

22. *Bernard*, 757 F.2d at 1440–41.

23. *Id.* at 1441.

24. *See id.*

25. *Id.*

26. *Spietz*, 531 P.2d at 525.

27. *See id.*

basis for a reasonable belief that additional suspects were present and posed a threat to the safety of the arresting officers.... Plain view alone could not justify the warrantless entry through the doorway into the constitutionally protected area of the ... house." [28]

In this case, both Donald and James Brand were outside of their residence when Sandahl arrived. Smith was still inside the residence when Sandahl first arrived, but by the time Sandahl had retrieved his patrol rifle, Trooper Haddad was securing Smith outside. Haddad testified that before Sandahl conducted the protective sweep, Brand was tasered, put away in the ambulance, and no longer a threat. Smith was secured and James Brand was wandering around not bothering anyone.

The trial court's decision does not explain why the officers believed they had to enter the residence in order to safely withdraw from the scene. Although the judge found that Smith had threatened the officers with a knife and dog, he did not indicate that the officers believed that these facts prevented their safe departure. There is no evidence in the record suggesting that the officers could not have safely withdrawn from the Brand home.

### B. The Protective Sweep Tainted Brand's Consent.

■ After Sergeant Sandahl discovered the grow operation, Trooper Mark Pearson arrived at the scene and asked Brand for his consent to search the house. While Brand was handcuffed in the back of the ambulance, Pearson had him sign a waiver consenting to the search of the residence. Brand now argues that the unlawful protective sweep tainted his consent and rendered the search invalid.

■ "When the police obtain the defendant's consent after conducting an illegal search or arrest, the unlawful police action presumptively taints the defendant's related consent to search." [29] To overcome this presumption, "the government must demonstrate a break in the 'causal connection' between the prior illegality and the defendant's consent." [30] That is to say, "[u]nless the government can show that the consent is sufficiently insulated from the prior misconduct, the defendant's consent is considered to be tainted." [31]

In this case, Trooper Pearson obtained Brand's consent to search the residence after Sandahl had already conducted a protective sweep. Accordingly, if the protective sweep was illegal, then the State would have to show "a break in the causal connection" sufficient to insulate the consent Pearson obtained from the search that Sandahl conducted. However, the State has not presented any argument that Brand's consent was not tainted.

Trooper Pearson arrived at the scene after Brand had been arrested and tasered, and after Sandahl had conducted the protective sweep. Pearson was aware that the sweep had been conducted and that the marijuana-growing operation had been discovered. Brand was handcuffed in the back of the ambulance when Pearson asked him about the marijuana plants in the residence and threatened to obtain a search warrant if Brand did not consent to a search. Under these circumstances, we conclude that Brand's consent was tainted by the prior illegal search of his home.

### III. CONCLUSION

We therefore REVERSE the superior court's judgment.

**28.** *Id.*

**29.** *Moore v. State*, 119 P.3d 1018, 1020 (Alaska App.2005) (citing *Norman v. State*, 379 So.2d 643, 646–47 (Fla.1980); *Brown v. Illinois*, 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 486, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963)).

**30.** *Id.* (citing *Florida v. Royer*, 460 U.S. 491, 507–08, 103 S.Ct. 1319, 1329, 75 L.Ed.2d 229 (1983); *Wong Sun*, 371 U.S. at 487–88, 83 S.Ct. at 417; *United States v. Melendez–Garcia*, 28 F.3d 1046, 1053 (10th Cir.1994)).

**31.** *Id.* at 1020–21 (citing *United States v. Taheri*, 648 F.2d 598, 601 (9th Cir.1981)).