Kristian **SKJERVEM**, Appellant,

v.

**STATE of Alaska**, Appellee.

No. A–9972.

Court of Appeals of Alaska.

Sept. 18, 2009.

---

Renee McFarland, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for the Appellant.

Timothy W. Terrell, Assistant Attorney General, Office of Special Prosecutions and Appeals, Anchorage, and Talis J. Colberg, Attorney General, Juneau, for the Appellee.

Before: COATS, Chief Judge, and MANNHEIMER and BOLGER, Judges.

*OPINION*

MANNHEIMER, Judge.

Kristian Skjervem appeals his conviction for fourth-degree controlled substance misconduct (possession of cocaine).[1] The issue on appeal is whether the evidence against Skjervem was the fruit of an unlawful search or seizure. For the reasons explained here, we conclude that we can not resolve this issue without further findings of fact. We

---

1. AS 11.71.040(a)(3)(A).

therefore remand this case to the superior court.

*Overview of the facts underlying this case*

Although the facts pertaining to the legality of the searches in this case must be described in some detail, the basic events underlying this case can be described in a few sentences:

Several Anchorage police officers were summoned to a residence on West 25th Avenue after a neighbor reported that a woman was breaking into the house. When the police arrived, they observed a woman trying to replace a window screen from inside the house. They also observed a car in the driveway; Skjervem was in the driver's seat of this car, and another man was in the front passenger seat.

The police took everyone into custody at gunpoint. A few minutes later, however, the owner of the house appeared on the scene and explained that there was no burglary. The woman was staying at the house with his permission, but she had left her key inside the house and then had locked herself out— which explained why she removed a window screen and entered the house through the window. As to Skjervem, he was there by complete coincidence: he was simply dropping off his passenger.

The issues presented in this appeal all arose because the police did not release Skjervem after their suspicions about the burglary were resolved.

*A more detailed look at the searches and seizures in this case*

When the police first arrived at the house and it appeared that a burglary was in progress, the officers ordered Skjervem and his passenger out of the car at gunpoint. The officers handcuffed Skjervem, patted him down for weapons (and found none), and then put him in one of the patrol cars. After about 15 minutes, Officer Robert Blanton removed Skjervem from this first patrol car and placed Skjervem in Blanton's own patrol car.

Skjervem remained in custody in Blanton's patrol car for another 10 or 15 minutes. Although the superior court made no express finding on this issue, there is substantial evidence suggesting that, during this time (*i.e.*, while Skjervem was sitting in handcuffs in Blanton's patrol car), the owner of the house showed up and explained that there was no burglary, and the police began to release the people whom they were holding in custody.

But instead of releasing Skjervem, the supervising officer at the scene—Sergeant Pablo Paiz—directed Officer Blanton to remove Skjervem from his (Blanton's) patrol car and bring him to Paiz, still in handcuffs.

According to Paiz's testimony, he directed Blanton to do this because he had looked into Skjervem's car and had seen a small, round, gold-colored canister on the front seat of the car. Paiz stated that this canister was "about the size you would make if you circled your . . . thumb and index finger". In other words, the canister was apparently shallow and a little bit larger in diameter than a quarter—similar to some popular lip balm containers. (Blanton testified that he, too, observed this canister on the front seat of Skjervem's car.)

The presence of this small, gold-colored canister made Paiz suspicious because, "[f]rom [his] experience, people [who] are involved with drugs will carry small quantities of drugs in these types of boxes". Paiz believed that Skjervem might be using this small, gold-colored canister as a "stash box", and he therefore wanted to question Skjervem about drugs before releasing him from custody.

In a footnote to one of the superior court's written decisions in this case—the "Order re Motion for Reconsideration" dated September 12, 2006—the superior court declared that, in addition to the small, gold-colored canister, Sergeant Paiz also observed a green crack pipe and an associated push rod on the seat of Skjervem's vehicle. Somewhat curiously, however, the superior court did not rely on this fact as a justification for the officers' continued detention of Skjervem.

Moreover, it is debatable whether the record supports this finding of fact. It is true that, when Paiz first described these events,

his testimony suggested that he observed all of these items—not only the small, gold-colored canister, but also the crack pipe and the push rod—at the same time, from a vantage point outside of Skjervem's car. However, when Paiz was questioned further on this issue, he seems to have clarified that he had observed only the small, gold-colored canister at the time he began interrogating Skjervem—and that the other items were discovered later, hidden behind a backpack that was lying on the seat of Skjervem's car, when Paiz and another officer (Charles Robertson) entered the vehicle and searched it.

The testimony of Officers Blanton and Robertson corroborates this latter version of events. Blanton testified that when he looked into Skjervem's car (from the outside), he saw the small, gold-colored canister on the front seat, as well as a backpack and a cell phone, but he did not see any other items. Blanton further testified that he certainly would have made note of the crack pipe if he had seen it.

For his part, Officer Robertson testified that when he entered and searched Skjervem's car, he was not looking for drugs, but rather for weapons. According to Robertson, the search of the car took place after Skjervem had been questioned by Sergeant Paiz and had admitted that he was carrying a small amount of marijuana in the gold-colored canister. Robertson told the court that he was assigned to search Skjervem's car because the police were still considering releasing Skjervem at this point—"because [it was just a] little bit of marijuana"—and they wanted to make sure that there were no items in the car that might pose a threat to them once Skjervem was released.

For these reasons, we have serious doubts about the assertion in the superior court's footnote that Sergeant Paiz saw the crack pipe and the associated paraphernalia in plain view on the seat of Skjervem's car. But because we must send this case back to the superior court for a further finding on a different factual issue, we need not decide at present whether the assertion in the footnote is clearly erroneous.

Aside from the factual controversy that we have just described, there were also significant differences between the testimony given by Sergeant Paiz and the testimony given by Skjervem concerning what happened after Officer Blanton brought Skjervem over to Sergeant Paiz for questioning. However, for purposes of our decision, we will adhere to the version offered by Sergeant Paiz, because the superior court found Paiz's version to be more credible.

According to Sergeant Paiz, when Skjervem was brought to him for further questioning, Paiz asked Skjervem what was in the small, gold-colored canister, and Skjervem replied that the canister contained marijuana. Paiz also testified that he asked Skjervem if the officers could search his car, and Skjervem consented.

After receiving this consent, both Paiz and Officer Robertson searched Skjervem's vehicle. Their searches yielded two crack pipes, a push rod, and a battery-powered gram scale. Following the seizure of this drug paraphernalia, Paiz directed Blanton to search Skjervem's person again, this time more thoroughly. During this search, Blanton felt a lump in one of Skjervem's socks. When Blanton asked Skjervem what this was, Skjervem replied that it was crack cocaine.

*The superior court's rulings*

Superior Court Judge Phillip R. Volland suppressed Skjervem's two admissions of drug possession—his statement that the gold-colored canister contained marijuana, and his statement that the lump in his sock was a packet of cocaine-because Judge Volland concluded that these two statements were the products of custodial interrogation, and the police had not yet advised Skjervem of his *Miranda* rights. Nevertheless, Judge Volland ruled that the police lawfully found and seized the marijuana and the cocaine.

Judge Volland concluded that the police were initially justified in taking Skjervem into custody because of their reasonable belief that there was a burglary in progress, and that Skjervem might be connected to the burglary.

Judge Volland further ruled that, even after the police learned that there was no

burglary occurring, the police were justified in continuing to detain Skjervem because the officers observed the small, gold-colored canister—what Paiz described as a "stash box"—on the front seat of Skjervem's vehicle. The judge concluded that the presence of this small, gold-colored canister gave the police reasonable suspicion that Skjervem was in possession of a small quantity of an illicit drug.

Judge Volland next concluded that the search of Skjervem's vehicle was justified because Skjervem consented to this search. As already explained, this search yielded two crack pipes, a push rod, and a gram scale. Judge Volland ruled that the discovery of this drug paraphernalia gave the police probable cause to arrest Skjervem—and thus to search him again more thoroughly (*i.e.*, because they could now search him, incident to arrest, for evidence of drug possession as well as for weapons).

As we have explained, this renewed search led to the discovery of the packet of cocaine in Skjervem's sock. Although Judge Volland suppressed Skjervem's statement that this lump in his sock was a packet of cocaine, the judge concluded that the contents of the packet inevitably would have been revealed, given that the police were arresting Skjervem for possession of the crack pipes. Judge Volland therefore denied Skjervem's motion to suppress the cocaine.

*Why we remand this case to the superior court to resolve two factual issues: (1) whether the police already knew that there was no burglary when Sergeant Paiz directed Officer Blanton to bring Skjervem to him (still in custody) for questioning; and (2) whether the crack pipe and push rod were lying in plain view on the seat of Skjervem's car*

■ Skjervem does not dispute that the police could lawfully detain him when they thought that there was a burglary in prog-

ress. However, the police continued to hold Skjervem in custody even after they learned that there was no burglary. Thus, the legality of the ensuing events—the events leading to the seizure of the drug paraphernalia in Skjervem's car and the packet of cocaine in Skjervem's sock—hinges on whether the police were justified in continuing to hold Skjervem in custody even after the burglary investigation was resolved.

In its brief to this Court, the State characterizes this issue as whether the police needed an affirmative reason to alter the "focus" of their pre-existing investigative stop of Skjervem. But that is not the issue. Rather, the issue is whether the police needed a separate, legally sufficient reason to continue to detain Skjervem after the suspicions that led to the initial investigative stop had been resolved. The answer to this question is "yes": the police needed an affirmative justification for continuing to detain Skjervem.

In *Brown v. State*, 182 P.3d 624, 625 (Alaska App.2008), this Court quoted the plurality opinion in *Florida v. Royer*[2] for the proposition that an investigative stop "must be temporary and must last no longer than is necessary to effectuate the purpose of the stop". The detention becomes unreasonable—and thus constitutionally invalid—"if the duration, manner, or scope of the investigation exceeds these boundaries." *Brown*, 182 P.3d at 625.[3]

Thus, if the burglary investigation had already been resolved when Sergeant Paiz directed Officer Blanton to bring Skjervem to him in handcuffs for further questioning, this continued detention of Skjervem would be illegal unless the police had a separate, independent justification for their action—either probable cause to arrest Skjervem for a crime, or reasonable suspicion that Skjervem had committed a sufficiently serious crime to satisfy Alaska's standard for investigative stops (the *Coleman* test).[4]

---

**2.** 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983).

**3.** Citing *Royer*, 460 U.S. at 500, 103 S.Ct. at 1325–26.

**4.** See *Coleman v. State*, 553 P.2d 40, 46 (Alaska 1976) (holding that, under the Alaska Constitu-

tion, the authority of the police to conduct investigative stops based on less than probable cause is limited to situations where the officers have reasonable suspicion of an imminent public danger or of recent serious harm to persons or property).

*(a) The observation of the small, gold-colored canister on the seat of Skjervem's car did not provide a justification for the officers' continued detention of Skjervem*

■ As we noted earlier in this opinion, even though Judge Volland asserted in a footnote that Sergeant Paiz saw a crack pipe and a push rod in plain view on the seat of Skjervem's vehicle, the judge did not rely on this fact when he ruled on Skjervem's suppression motion. Instead, Judge Volland's ruling was based solely on Paiz's observation of the small, gold-colored canister on the seat of Skjervem's car.

Judge Volland concluded that, even after the police learned that no burglary was in progress, the officers were justified in continuing to detain Skjervem because Sergeant Paiz was able to see the small, gold-colored canister on the front seat of Skjervem's vehicle, and because Paiz testified that this small container "looked to [him like] a 'stash box'". That is, the canister looked like the type of small container that "people [who] are involved with drugs" will sometimes use to "carry small quantities of drugs".

Because Judge Volland concluded that the observation of the small, gold-colored canister was itself a sufficient justification for Skjervem's continued detention, the judge did not expressly decide the factual question of when exactly, during these events, the police found out that there was no burglary. Under Judge Volland's view of the case, it made no difference whether this discovery (*i.e.*, the fact that there was no burglary) came before or after Sergeant Paiz directed Officer Blanton to bring Skjervem to his car in handcuffs for further questioning—because Paiz had already observed the small, gold-colored canister.

But even assuming that Paiz reasonably suspected that the small, gold-colored canister held a small amount of an illicit drug, the officers' continued detention of Skjervem would still be illegal. Alaska law does not allow investigative stops based on reasonable suspicion that a person possesses a small amount of an illegal drug for personal use.

In *Coleman v. State*, 553 P.2d 40 (Alaska 1976), our supreme court held that not every reasonable suspicion of criminal activity will justify an investigative stop under the Alaska Constitution. Rather, investigative stops are limited to situations where the police have "reasonable suspicion that imminent public danger exists or [that] serious harm to persons or property has recently occurred". *Coleman*, 553 P.2d at 46.

In *Pooley v. State*, 705 P.2d 1293 (Alaska App.1985), this Court held that an investigative stop was justified when the police had reasonable suspicion that the person they detained was in possession of marijuana for purposes of distribution or sale. Applying the *Coleman* rule, we concluded that the commercial sale of drugs posed a sufficient danger to the public to warrant an investigative stop based on reasonable suspicion. *Pooley*, 705 P.2d at 1307.

Applying the decision in *Pooley*, we have upheld investigative stops based on reasonable suspicion of drug possession in situations where the circumstances indicated an intent to sell or where the quantities were large enough to suggest an intent to sell. *See, e.g., LeMense v. State*, 754 P.2d 268, 272–73 (Alaska App.1988).

But in *Joseph v. State*, 145 P.3d 595 (Alaska App.2006), we held that the *Coleman* rule prohibited investigative stops based on reasonable suspicion that the person detained possessed a small amount of marijuana for personal use—because this suspected crime does not involve imminent danger to the public or serious harm to persons or property. *Joseph*, 145 P.3d at 598.

In Skjervem's case, if the police continued to detain him after the burglary investigation was resolved, this detention can not be justified by the suspicion that Skjervem had a small amount of an unspecified drug in the canister. (As we explained earlier in this opinion, Skjervem soon admitted to Paiz that there was marijuana in the canister, but Judge Volland suppressed Skjervem's statement because it was obtained in violation of *Miranda*.)

Paiz did not testify that he suspected that Skjervem was selling drugs (and the State

presented no other evidence on this point). Rather, Paiz simply declared that the presence of the canister in Skjervem's car led him to suspect that Skjervem might be carrying a "small quantit[y] of drugs". Thus, Skjervem's case is not like *Pooley,* where the suspected crime was possession of drugs for purposes of sale. Instead, Skjervem's case is like *Joseph,* where the suspected crime was possession of a small quantity of drugs for personal use.

For this reason, we conclude that, under the Alaska Constitution, the observation of the small, gold-colored canister on the seat of Skjervem's car was not a sufficient justification for continuing to hold Skjervem in custody after the matter of the burglary was resolved. Once the officers determined that no burglary had occurred, they no longer had a reasonable suspicion that Skjervem was involved in "[recent] serious harm to persons or property" (*i.e.,* the apparent residential burglary), and the observation of the canister did not give the officers a reasonable suspicion that Skjervem's activities posed an "imminent public danger". Thus, neither prong of the *Coleman* test was satisfied.

In its brief to this Court, the State argues that the *Coleman* test was satisfied because, if the police had reasonable suspicion that the small, gold-colored canister in Skjervem's car contained drugs, the police would also have had reasonable suspicion that Skjervem might consume these drugs and then continue to operate his vehicle while under the influence. (Operating a motor vehicle under the influence is an "imminent public danger" for purposes of *Coleman.* See *Ebona v. State,* 577 P.2d 698, 701 (Alaska 1978).)

To support its argument, the State relies on *Wilburn v. State,* 816 P.2d 907 (Alaska App.1991), and *Hartman v. Division of Motor Vehicles,* 152 P.3d 1118 (Alaska 2007). However, the facts of these two cases are distinguishable from the situation presented here.

In *Wilburn,* the police observed the defendant actively using drugs while sitting in a motor vehicle. 816 P.2d at 911. And in *Hartman,* the police had information that the defendant had been driving while intoxicated a short time before the investigative stop, as well as a reasonable suspicion that the defendant might resume driving. 152 P.3d at 1120 & 1123–24.

In contrast, the police officers who took Skjervem into custody, and who were in close quarters with Skjervem for the 20 to 30 minutes it took to resolve the burglary matter, testified that Skjervem was calm and cooperative. None of these officers mentioned any suspicion or indication that Skjervem was intoxicated.

Obviously, Skjervem was going to continue to drive his car if the police released him. But while operating a motor vehicle under the influence of drugs poses an imminent public danger for purposes of *Coleman,* operating a motor vehicle that contains a small canister of drugs for personal use does not, by itself, pose an imminent public danger under *Coleman.* For *Coleman* purposes, the "imminent public danger" is that the vehicle will be driven in a dangerous manner, or that the drugs will be distributed commercially— not that the vehicle is carrying a container of an intoxicating substance that may later be put to personal use. If we adopted the State's argument, we would effectively be authorizing investigative stops of motor vehicles whenever the police have reasonable suspicion that there are containers of alcoholic beverages in the vehicle.

*(b) Whether the officers could lawfully search Skjervem's car, given the fact that Skjervem consented to this search*

■ According to the version of events adopted by Judge Volland in his decision, the police searched Skjervem's car only after Skjervem consented to this search. If Skjervem's consent to this search remains valid despite the potential unlawfulness of the police conduct that preceded it, then the evidence found in Skjervem's car would be admissible against him in any event, and there would be no need to remand this case to the superior court. On the other hand, if Skjervem's consent to the search of his car was the tainted fruit of earlier illegal police activities, then the evidence obtained during the search of Skjervem's car would have to be suppressed.

 If Skjervem gave the consent to search while he was being unlawfully detained (in other words, if the burglary investigation had already been resolved, and if the crack pipe and push rod were not in plain view on the seat of his car), then Skjervem's consent to the search would presumptively be tainted by his unlawful detention. As this Court recently noted in *Brand v. State*, 204 P.3d 383 (Alaska App.2009), "[w]hen the police obtain the defendant's consent [to a search] after conducting an illegal search or arrest, the unlawful police action presumptively taints the defendant's related consent to search." *Brand*, 204 P.3d at 389 (quoting *Moore v. State*, 119 P.3d 1018, 1020 (Alaska App.2005)).[5] "To overcome this presumption [of taint], the government must demonstrate a break in the 'causal connection' between the prior illegality and the defendant's consent." *Id.* (internal quotation omitted).

Thus, if it was unlawful for the police to continue their detention of Skjervem, the next issue is whether Skjervem's consent to the search of his car was sufficiently insulated from the unlawful detention. (Judge Volland did not reach this issue—whether Skjervem's consent to the search of his car was tainted by the unlawful detention—because the judge concluded that Skjervem's continued detention was, in fact, lawful.)

In his brief to this Court, Skjervem argues that his purported consent to the search was a direct result of his unlawful detention, and that all evidence obtained from the ensuing search must be suppressed. In the alternative, Skjervem asks this Court to remand his case to the superior court for a determination as to whether, and to what extent, Skjervem's unlawful detention tainted his consent to the search.

The State, in its brief, does not address the possibility that Skjervem was unlawfully detained at the time he gave his consent to the search of the car. In other words, even though it is the government's burden to establish a lack of taint, the State presents no argument that, even if Skjervem's detention was unlawful, his consent to the search should nevertheless be deemed untainted by the unlawful detention.

The testimony at the evidentiary hearings in this case established that Skjervem had been sitting, handcuffed, in the back of a patrol car for approximately 20 to 25 minutes when, at the request of Sergeant Paiz, he was removed from the patrol car and brought (still handcuffed) to Paiz for further questioning.

Skjervem testified that, when he was taken from Blanton's patrol car to be questioned by Sergeant Paiz, the owner of the house had already arrived on the scene and had explained to the police that there was no burglary—because, as Skjervem sat in the patrol car, he overheard two police officers discussing this matter. When Officer Blanton came to retrieve Skjervem from the back of the patrol car, Skjervem assumed that he was being released. But instead, Skjervem was brought to Sergeant Paiz, still in handcuffs. Judge Volland ruled that, at this point, Skjervem was in custody for *Miranda* purposes. (This is why the judge suppressed Skjervem's admission that the gold-colored canister contained marijuana.)

Given this testimony, there was no break in the action that would insulate Skjervem's consent from the effects of his unlawful continued detention. We therefore conclude that if Skjervem's continued detention was unlawful (*i.e.*, if the burglary investigation had already been resolved, and if the crack pipe and push rod were not in plain sight on the seat of Skjervem's car), then Skjervem's consent to search his car was tainted by his unlawful detention.

Although the State's brief fails to address the issue of whether Skjervem's consent was tainted by his illegal detention, the State does address a related issue: whether Skjervem's consent was voluntary. Using the analysis set forth in *Frink v. State*, 597 P.2d 154 (Alaska 1979), the State argues that the totality of circumstances support a finding that Skjervem's consent was voluntary.

But as Professor LaFave points out in his text on search and seizure, even though there

---

5. *See Brown v. Illinois*, 422 U.S. 590, 601–04, 95 S.Ct. 2254, 2260–62, 45 L.Ed.2d 416 (1975); *Wong Sun v. United States*, 371 U.S. 471, 485–86, 83 S.Ct. 407, 416, 9 L.Ed.2d 441 (1963).

is often substantial overlap between the issues of whether a consent to search is voluntary and whether a consent to search is the fruit of a prior illegality, "it is extremely important to understand that ... the two tests are not identical, and [that,] consequently[,] evidence obtained by [means of] the purported consent should be held admissible only if ... the consent was *both* voluntary and not an exploitation of the prior illegality." Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* (4th ed.2004), § 8.2(d), Vol. 4, p. 76 (footnotes omitted) (emphasis in the original).

Thus, even though the State may be correct in asserting that Skjervem's consent meets the test for voluntariness, this does not mean that the evidence obtained through the ensuing search of Skjervem's car is admissible—because, even if Skjervem's consent was voluntary, this would not negate the fact that Skjervem's consent was the fruit of an unlawful detention.

There is, however, another possible version of events: that the burglary investigation was not yet resolved when Sergeant Paiz questioned Skjervem. If, at the time Paiz questioned Skjervem, the police still reasonably believed that they had just interrupted a residential burglary, then the continued detention of Skjervem would have been justified, and the police could presumably question Skjervem and seek his consent for a search of his vehicle. But even if Skjervem was lawfully detained at the time of this questioning, Skjervem's consent to search the vehicle might still be invalid.

Judge Volland ruled that Sergeant Paiz's interrogation of Skjervem took place in violation of *Miranda*—and, for this reason, Judge Volland suppressed Skjervem's admission that the small, gold-colored canister contained marijuana. If Skjervem consented to the search of his car after he admitted that the small canister in his car contained marijuana, then his consent to search might be tainted by the *Miranda* violation—although the resolution of this issue is not clear.

In *United States v. Patane*, 542 U.S. 630, 634, 124 S.Ct. 2620, 2624, 159 L.Ed.2d 667 (2004), the Supreme Court held that the exclusionary rule did not require suppression of physical evidence obtained as a result of statements taken in violation of *Miranda*. The defendant in *Patane* was questioned, in violation of *Miranda*, about a pistol. During this questioning, Patane admitted that the pistol was in his bedroom, and he gave the police permission to retrieve the pistol.[6] The Supreme Court concluded that the self-incrimination clause of the Fifth Amendment protected Patane only against the use of his statement itself, and did not protect him against the use of the physical evidence that the police recovered as a result of his statement (*i.e.*, the pistol).[7]

But the facts of Skjervem's case are arguably different from the situation presented in *Patane*. In Skjervem's case, after he admitted that the small, gold-colored canister contained marijuana, the police did not simply ask him if they could retrieve the canister. Rather, they asked Skjervem to consent to a search of his entire car—and that search revealed evidence of different (and significantly more serious) crimes.

We note, moreover, that several state courts have rejected the *Patane* rule on state constitutional grounds. *See Commonwealth v. Martin*, 444 Mass. 213, 827 N.E.2d 198, 200 (2005); *State v. Farris*, 109 Ohio St.3d 519, 849 N.E.2d 985, 995–96 (2006); *State v. Vondehn*, 219 Or.App. 492, 184 P.3d 567, 575–76 (2008), *review granted* 345 Or. 460, 200 P.3d 146 (December 10, 2008); *State v. Peterson*, 181 Vt. 436, 923 A.2d 585, 593 (2007); *State v. Knapp*, 285 Wis.2d 86, 700 N.W.2d 899, 918 (2005).

If, on remand, Judge Volland determines that the burglary investigation was still unresolved when Skjervem consented to have the police search his car, then Judge Volland should address the question of whether the *Miranda* violation bars the State from using the physical evidence recovered as a result of Skjervem's consent to search.

**6.** *Id.*, 542 U.S. at 635, 124 S.Ct. at 2625.

**7.** *Id.*, 542 U.S. at 643–44, 124 S.Ct. at 2630 (Justice Thomas, writing for the three-member plurality) and 542 U.S. at 645, 124 S.Ct. at 2631 (Justice Kennedy, writing for the two-member concurrence).

*(c) Whether the renewed search of Skjervem's person, which yielded the packet of cocaine, was lawful*

█ As we explained earlier, Officer Blanton performed a pat-down search of Skjervem when he first took Skjervem into custody. Then, after Sergeant Paiz and Officer Robertson searched Skjervem's vehicle and recovered the crack pipes, the gram scale, and the other drug paraphernalia, Sergeant Paiz directed Officer Blanton to search Skjervem's person again, this time more thoroughly. During this search, Blanton felt a lump in one of Skjervem's socks. When Blanton asked Skjervem what this was, Skjervem replied that it was crack cocaine. (As we have already explained, Judge Volland suppressed Skjervem's statement because he concluded that the statement was elicited in violation of *Miranda*.)

The question is whether the discovery of the cocaine in Skjervem's sock was tainted by the earlier acts we have just discussed (if those acts were unlawful).

When Judge Volland denied Skjervem's motion to suppress the evidence in this case, the judge made alternative rulings as to why the discovery of the packet of cocaine was lawful. The judge issued alternative rulings because he found that it was not clear, from the testimony, whether the second search of Skjervem's person took place before or after the police found the crack pipes and other drug paraphernalia in Skjervem's car.

Judge Volland first concluded that, if the search of Skjervem's person was conducted after the discovery of the crack pipes and other drug paraphernalia in Skjervem's car, then the search was justified as a search incident to arrest—because the police would have had probable cause to arrest Skjervem at that time.

(It is important to note that Judge Volland's rationale was *not* that the crack pipe and push rod were in plain view on the seat of Skjervem's car from the very beginning, before Skjervem was interrogated in handcuffs by Sergeant Paiz. Rather, the judge's rationale was that (1) the small, gold-colored canister was visible from outside Skjervem's vehicle; (2) the observation of this canister

gave the police a sufficient justification for continuing to detain Skjervem; (3) during the ensuing interrogation by Sergeant Paiz, Skjervem consented to have the police search his vehicle; and (4) this search yielded the crack pipes and other drug paraphernalia.)

Judge Volland alternatively concluded that, even if the search of Skjervem's sock occurred before the discovery of the crack pipes and other drug paraphernalia in Skjervem's vehicle, the police were nevertheless entitled to repeat their pat-down search of Skjervem's person for weapons—because Skjervem had lawfully been subjected to investigative detention.

In its brief to this Court, the State addresses only the first of these rationales. That is, the State argues that the renewed search of Skjervem's person was a valid search incident to arrest, based on the fact that the police had probable cause to arrest Skjervem following the discovery of the drug paraphernalia in Skjervem's car.

We have already explained why we conclude that the search of Skjervem's car was unlawful if the police continued to detain Skjervem after the burglary investigation was resolved, and (alternatively) that the search of Skjervem's car may have been unlawful if Skjervem's consent to this search was tainted by the *Miranda* violation. Under either of these theories, any renewed search of Skjervem's person could not be justified as a search incident to an arrest based on the items found in Skjervem's car.

This leaves Judge Volland's alternative ruling: that even if the police did not have probable cause to arrest Skjervem when they conducted the second pat-down search of Skjervem's person, the police were nevertheless entitled to conduct that second pat-down as part of their continued investigative detention of Skjervem. But this alternative ruling must be rejected if the burglary investigation had already been resolved and Skjervem's continued detention was unlawful.

For these reasons, we conclude that if Skjervem was detained after the police found out that there was no burglary, and if the crack pipe and the push rod were not in plain view on the seat of Skjervem's car (to an

observer standing outside the car), then the packet of cocaine found in Skjervem's sock must be suppressed.

*Conclusion*

For the reasons explained in this opinion, we conclude that we must remand this case to the superior court for supplemental findings on two issues of fact.

First, the superior court must determine whether Sergeant Paiz, standing outside Skjervem's car, observed a crack pipe and associated push rod in plain view on the seat of the car. As we have explained, Judge Volland seemingly made a finding in the State's favor on this point, but the judge inserted this finding in a footnote, and he did not rely on this finding when he made his various rulings in this case. Moreover, as we have also explained, there is a significant amount of testimony that calls this finding into question. We therefore direct Judge Volland to re-examine this issue.

Second, the superior court must determine when the police found out that there was no burglary—whether this knowledge came before or after Sergeant Paiz began his custodial interrogation of Skjervem. If the police continued to hold Skjervem in custody after the burglary investigation was resolved, and if their only justification for this continued detention was the observation of the small, gold-colored canister, then the continued detention of Skjervem was illegal—and all of the evidence stemming from that continued detention must be suppressed.

The superior court shall enter findings on these two questions. The court may do this based simply on a review of the testimony already presented at the evidentiary hearings in this case; alternatively, the superior court may, in its discretion, hear supplemental testimony on these issues.

The superior court shall reduce its findings to writing and shall transmit its written findings to this Court within 60 days of the issuance of this opinion.

The parties shall then have 30 days to file supplemental memoranda addressing the superior court's findings.

After we have received the parties' supplemental memoranda, we shall resume our consideration of this case.

We retain jurisdiction of this case.

BOLGER, Judge, concurring.

BOLGER, Judge, concurring in the result.

I concur in the result of the lead opinion because I agree that this case should be remanded for further findings. I write separately because my view of the record diverges from my colleagues' on certain key issues.

The lead opinion suggests that the police continued to hold Skjervem in custody after they learned that there was no burglary and before they discovered the drug paraphernalia in Skjervem's car. But the trial court's decision strongly implies that Sergeant Paiz discovered the drug paraphernalia in Skjervem's vehicle before the officer was aware that the owner of the residence arrived at the scene. Indeed, there is substantial evidence in the record supporting this implication of the trial court's ruling when the record is viewed in the light most favorable to that decision.[1]

Paiz testified that there were already a number of officers present when he arrived at the residence around 5:15 p.m. He noticed a tan Ford vehicle in the parking space directly in front of the residence. Paiz initially tried to question the woman who had been taken into custody, but she was too agitated to respond in a rational manner. He then went into the residence with several other officers to make sure that there was no one else inside.

The officers finished "clearing" the residence at about 5:30 p.m. At that point, Paiz went to look at the tan vehicle parked in front of the residence. This was when he observed the drug paraphernalia in the front seat and directed another officer to bring Skjervem to the vehicle. It was then that

1. *See Crawford v. State,* 138 P.3d 254, 258 (Alaska 2006); *State v. Campbell,* 198 P.3d 1170, 1173 (Alaska App.2008) (holding that the record should be viewed in the light most favorable to the prevailing party when reviewing a trial court's disposition of a motion to suppress).

Skjervem agreed to let the police search the vehicle.

Additionally, Paiz was familiar with the owner of the residence, Steve Grizzell. On cross examination, Paiz was questioned about whether Grizzell was in the car with Skjervem when the police first arrived, or whether Grizzell was in a patrol car after Paiz cleared the residence. Paiz's responses suggested that Grizzell was not present. There was nothing in his report to indicate exactly when Grizzell arrived. But Paiz did recall that the burglary investigation was underway when he walked out of the residence, and that it was still underway shortly thereafter when he had Skjervem brought over to the vehicle.

Paiz's description of this part of the investigation is supported by the testimony of Officer Arthur Anderson, the officer who actually spoke with Grizzell. Anderson was one of the first officers to arrive at the residence after receiving a dispatch call for a burglary in progress. He assisted in detaining the woman who was putting a screen back on one of the windows and observed other officers detaining Skjervem and his car's passenger in the driveway. Grizzell did not arrive until after the officers had cleared the residence—when they were at the "end stages" of "clearing everything up." Anderson spoke with Grizzell, who confirmed that the two people the police had detained at the residence had his permission to be there.

The lead opinion relies on Officer Blanton's testimony suggesting that the owner of the house arrived and talked with Paiz while Blanton was waiting in his patrol car with Skjervem. But Blanton's testimony on this point is not based on his personal observations. At first, Blanton said that Paiz had talked with Grizzell, but that he did not know what they discussed. Blanton then clarified that he only assumed that Paiz had talked with Grizzell because of a radio transmission stating that the house's owner had arrived. Blanton was unsure about the time frame, but it made sense to him that the owner arrived before Blanton brought Skjervem over to the vehicle to talk with Paiz.

In my opinion, the description by Anderson and Paiz about the sequence of events is more convincing than Blanton's recollection, which was based on speculation from a radio transmission. The testimony by Anderson and Paiz supports the judge's conclusion that Paiz had discovered the paraphernalia in Skjervem's vehicle before Grizzell arrived, and that this discovery allowed the police to detain Skjervem even after Grizzell told them that no burglary had occurred.

The majority opinion also questions Judge Volland's finding that Paiz saw the crack pipe and other drug paraphernalia before he asked Skjervem for his consent to search the vehicle. However, there is substantial support in the record for the judge's finding that "Paiz observed not only a 'stash box,' but a backpack, two lighters, a wallet, a green crack pipe, and a pushrod when he first looked into the window of Skjervem's vehicle."

As noted above, Paiz testified on direct examination that after the officers made sure that no one was inside the residence, he came outside and went over to look at the tan car in front of the residence. When he looked through the car's window, he saw a small round canister (which he called a "stash box"). He could also see a backpack, a green crack pipe, two plastic lighters, a wallet, and a push rod (a type of rod used to smoke crack cocaine). Only then did Paiz ask to have the driver, Skjervem, brought over to talk to him. Paiz asked Skjervem if the police could search his car, and Skjervem said that they could.

After Paiz obtained Skjervem's permission, he opened the driver's side door and looked into the vehicle. On cross-examination, Paiz initially asserted that, at that point, he could see the backpack, wallet, stash box, and crack pipe. He said that the backpack was positioned to the right side of the steering wheel, and that the other items were behind this backpack.

Paiz then clarified that he would not have seen the other items at that point if he had not moved the backpack. Shortly afterwards, however, he confirmed his prior recollection that all of the items were on top of the front seat. No one asked Paiz to clarify

the exact position of the drug paraphernalia. In particular, no one ever asked him whether he had actually seen the drug paraphernalia when he first looked into the car before he talked to Skjervem. Paiz did not concede that he had only observed the gold canister at the time he began interrogating Skjervem and that he discovered the other items only after he searched the vehicle.

The lead opinion suggests that Paiz told Blanton that he did not discover the crack pipe, the push rod, or the other drug paraphernalia until he actually searched Skjervem's vehicle. But Blanton's testimony implies that Paiz stated that he had discovered the drug paraphernalia in Skjervem's vehicle while Blanton was still sitting in his patrol car. This suggests that Paiz discovered the drug paraphernalia in Skjervem's vehicle *before* Paiz had Blanton bring Skjervem over to the vehicle.

Consequently, I conclude that Paiz's direct examination constitutes substantial evidence supporting Judge Volland's finding that "Paiz observed not only a 'stash box,' but a backpack, two lighters, a wallet, a green crack pipe, and a pushrod when he first looked into

the window of Skjervem's vehicle." It appears to me that Judge Volland did not discuss the implications of this finding because his decision also rested on an independent basis for Skjervem's detention: that Skjervem was still detained for the burglary investigation when Paiz asked to search the car.

I agree with the decision to remand this case because the proper result may hinge on these two disputed evidentiary issues. If Paiz saw all of the drug paraphernalia, including the crack pipe and stash box on the seat, before he talked to Skjervem, then Paiz would arguably have had probable cause to arrest Skjervem and to search him incident to that arrest.[2] Moreover, if Skjervem was legally detained for the burglary investigation when Paiz asked to search Skjervem's car, then his consent was not tainted by an illegal detention.[3]

---

**2.** See *Dollison v. State,* 5 P.3d 244, 246–47 (Alaska App.2000); *Snider v. State,* 958 P.2d 1114, 1118 (Alaska App.1998).

**3.** See *Hubert v. State,* 638 P.2d 677, 688 & n. 9 (Alaska App.1981).